J. W. DAVIS v. THE STATE.

*No. 6866.   Rehearing Refused June 4.*

**Practice—Charge of the Court.—**It is a rule of criminal practice that in felony cases the trial judge must give in charge to the jury the law applicable to every phase of case indicated by the evidence, however feeble and inconclusive such evidence may be, and an omission in the charge, if excepted to, will operate to reverse a conviction. But in the absence of exception, or a requested instruction to supply the omission, such omission will not be held reversible error unless, under all the circumstances of the case as disclosed by the evidence as a whole, it was calculated to injure or prejudice the rights of the accused.   The injury or prejudice contemplated by this rule must be probable, and if merely possible it will not suffice to reverse the conviction.   See the opinions for an elaboration of the question, and note that under the proof in this case the failure of the trial judge to instruct the jury upon murder in the second degree is not reversible error; no exception to such omission having been reserved, and no supplying instruction asked.

APPEAL from the District Court of Tarrant.   Tried below before Hon. R. E. Beckham.

The conviction in this case was in the first degree for the murder of B. C. Evans, in Fort Worth, Tarrant County, Texas, on the 6th day of July, 1889.   The death penalty was awarded by the jury.

Dr. W. P. Burts testified for the State that he was called to see B. C. Evans on the afternoon of July 6, 1889.   He found Evans just outside of the office railing in the carpet department of B. C. Evans Company's store.   He was then dead, but was being held upright in a chair by some attendants.   Death was caused by a pistol shot.   The fatal bullet struck him in the breast, between the second and third ribs, and ranged downward.   A second bullet struck him on the top of the head, ranged downward, and inflicted a scalp wound.

Edward Mason testified for the State, in substance, that he had known the defendant between five and six years, during the greater part of which time the defendant had been in the employ of the B. C. Evans Company, merchants, of Fort Worth.   His position was understood to be manager or head salesman of the clothing department of the Evans establishment. In conversation with the witness the defendant had uniformly spoken of deceased in kind and friendly terms, until on a certain Sunday something more than a month before the homicide.   On that occasion he was talking to the witness with the view of securing employment under the witness as a traveling agent or solicitor for a New York shirt manufactory.   In that conversation, and in other subsequent conversations, he told witness that the deceased had treated him badly; that, although he had served the deceased several years, the deceased had cut his salary, and placed a new man, at a better salary, over him in his department, and that he intended to leave the employment of the deceased as soon as he could get something else to do.   On these occasions the feeling towards

deceased manifested by the defendant was not friendly, but he made no hostile threats. He merely said that deceased had treated him badly— "like a damned rascal"—and that he was going to leave his service as soon as he could.

Dan Pritchard testified for the State, in substance, that about thirty minutes before the killing of Evans the defendant entered the gun store of A. J. Anderson, in which the witness was clerking, and asked if witness could sell him a good pistol at cost. Witness replied that he could sell him a pistol "close," but not at cost. Defendant then selected a six-shooting pistol, remarking that a bitch and about a dozen dogs were in the habit of prowling about his house at night, creating such a noise that he could not sleep well, and that he intended to "pepper" some of them. Witness loaded five chambers of the pistol and gave it to defendant. Defendant dropped the pistol into his coat pocket and started out, when witness advised him to buy a scabbard. He replied that as he never carried a pistol he had no use for a scabbard. Witness, however, prevailed on him to buy a scabbard upon the plea that it would preserve the pistol. Evans was killed about thirty minutes after the defendant left Anderson's store.

For purposes of convenient reference, the diagram of the clothing and carpet department of the B. C. Evans Company establishment, introduced in evidence by the State, is inserted. (See next page.)

Terry King, a clerk in the establishment of the B. C. Evans Company, was the next witness for the State. He testified, in substance, that the fatal shooting occurred a few minutes before 4 o'clock p. m., July 6, 1889. Between 2:30 and 3 o'clock on the fatal evening the defendant walked through the store from front to back, passing the witness behind the counter in his, witness's, department. He attracted the witness's attention by kicking a stool out of his way. He went on to the clothing department, and in a few minutes returned, passing the witness, to whom he spoke, uttering only the word "halloa!" Witness replied, "Halloa, Judge"—defendant's nickname. A few minutes later defendant again passed the witness, and lightly jerked a piece of cloth that witness was measuring for a customer. Witness smiled, but said nothing to defendant, who passed on to the clothing department. About twenty minutes later the defendant again came to where the witness was, and witness asked him, "What is the matter with you, Judge?" He replied, "Nothing." Witness then said to him, "I know, Judge, that something is wrong with you." Defendant then said, "Somebody has told damned lies on me to Mr. Evans, and I am going to get even with him if I find him out. I am going to raise hell here before 6 o'clock." Witness said to him, "Judge, don't talk that way; you are speaking a little loud, and somebody will think you are drinking." Defendant said, "Terry, I am just as sober as you are." Witness replied, "I know it, Judge, but people

will think so anyhow." Defendant then told witness that Mr. Evans had told him that he would not need him, defendant, after the 15th day of the month, but he did not say when Evans told him so. Witness saw defendant and Evans in conversation between 9 and 10 o'clock on that morning, but did not hear the conversation, nor did he observe whether the manner of either or both was friendly or otherwise.

A. L. Eckert, an employe in the Evans Company establishment, was the next witness for the State. He testified, in substance, that he was in the little office indicated on the diagram a few minutes before the killing of Evans. He had been there, standing by the west safe, facing Evans, who was sitting in the chair indicated on the diagram, about twenty minutes when the defendant entered the little office. He came through the west opening and passed through the front door. A few minutes later, at which time witness was still standing by the safe and Evans sitting in the chair reading a newspaper, the defendant again entered the little office. He stopped for a minute, appeared to feel for or hunt a paper on his person, and then turned and left through the east opening. Neither he nor Evans spoke a word. A moment later the witness left, going through the carpet department to the counting room, where he paid over some money that he had collected. When the witness left the little office Evans was seated in the chair, holding a newspaper before his face, and apparently reading. Having turned over the money the witness went to the shoe department, and had just reached that department when he heard two pistol shots. He ran at once through the main building, hearing two more pistol shots as he went. The last shot was fired about the time witness reached the Main Street door. Mr. Farmer went in at the Main Street front door about the time witness did. On entering the carpet department the witness found Evans, defendant, and Farmer. Evans was lying on his face on the floor with the crushed newspaper in his right hand and under his body. His feet were extended towards the door. He was then alive, and exclaimed two or three times, "Oh, God! Oh, Lord!" City Marshal Farmer arrested defendant at once. Defendant submitted without protest, surrendering his pistol to Farmer. The witness examined Evans's person, on which he found a 25-cent piece, a bunch of keys, a masonic watch charm, and an old broken-bladed pocket knife of small dimensions. The knife was closed, and when found was in the pants pocket. Witness did not see any of the shots fired.

Walter Wyatt testified for the State, in substance, that he was at work in the Evans Company's clothing department at the time of the killing of Evans. A few minutes before the shooting the defendant passed from the clothing to the carpet department, and almost immediately returned. Thence he went into a small dressing room in the clothing department. He remained in that room two or three minutes, and then went through the east opening into the carpet department. About the time defendant

passed through the east opening into the carpet department the witness started to the other end of the store, and had gone about two-thirds of the way when the first shot was fired.

W. F. Rogers testified for the State that he was at work in the Evans Company's clothing department at the time of the tragedy. Defendant and Evans had a conversation in the clothing department about 10 o'clock on the morning of the tragedy. They talked perhaps thirty minutes. Their manner was not such as to particularly attract the witness's attention. No anger was displayed by either of them. All that the witness heard Evans say to defendant was, "You have been doing this way a good while, and"— When he left the defendant Evans remarked to him in an apparently pleasant manner, "You have a big line of shirts." Defendant made no reply to that remark. A bifurcated curtain hung across the east opening between the clothing and carpet departments. Twice, to the witness's knowledge, the defendant went to that curtain, pushed one of the halves aside, and looked through into the carpet department. The last time witness saw him do so was about thirty minutes before the killing, at which time Eckert was in the little office talking with Evans.

The material part of the testimony of the State's witness Hugh Elliston was that at the time of the shooting he and Pres Hollingsworth, the manager of the carpet department, were together near the stairway in the west or rear end of the carpet room. Mr. Evans entered the little office at the north end of that room, and occupied the chair, a short while before the killing. Defendant came into the carpet department three times before the killing. The two first times Eckert was in the little office talking to Evans. When he entered the third time, which was but a minute or two before the killing, Eckert had gone, and there was no person in the front part of the carpet room except Mr. Evans, who was then in the office seated in the chair reading a newspaper. Witness saw defendant when he entered the carpet department through the east opening, just before the shooting, but did not observe him again until after the first shot was fired. The first shot next attracted his attention. As he looked up from the order book he and Hollingsworth were looking over, he saw Evans rise to his feet from the chair and fall forward on his face, still grasping the newspaper he had been reading. The words, and the only words, spoken at the time of the killing were spoken by Evans as he fell forward after receiving the first shot, and they were: "Oh, Mr. Davis, don't!" If defendant had spoken, or Evans said anything else, the witness would have heard it. The witness was absolutely certain that there was no person in the front part of the carpet room at the time of the shooting except Evans and defendant. Witness distinguished four shots. Farmer entered and arrested Davis immediately after the shooting. Pres Hollingsworth corroborated the testimony of this witness.

W. R. McLaury testified for the State, in substance, that at the time

of the tragedy he was standing on the sidewalk across the street from and immediately opposite the little office in which Evans was killed. He had an unobstructed view of Evans at the time. He, Evans, was seated in a chair reading a newspaper, which paper he had opened at full width. Witness was looking at Evans when defendant entered the little office. He stopped within a few feet—from five to seven—of Evans, and extended his arm as though to deliver something to Evans. About that time Evans moved the paper to one side, and appeared to say something. Defendant fired the first shot instantly. Evans pitched forward on his face, and while he was falling defendant fired the second shot. Unless Evans could see through the newspaper he did not see defendant, who approached him in front, until he moved the paper from before his face immediately before the first shot was fired. No person was on the sidewalk in front of the carpet room when the first shot was fired, and the witness saw no person in the front part of the carpet room at that time other than Evans and the defendant   The State closed.

Dr. W. A. Duninger testified for the defense that he examined the body of B. C. Evans after death. The wound in the breast, which was the fatal one, showed that the ball ranged downward and inward from the left to the right. Such range would sometimes indicate the position of the person shot at the time of the shooting, but muscle or bone would frequently deflect a ball and cause it to range in almost any direction.

G. L. Harris testified for the defense that he was in the carpet room and saw the first shot fired. He had just stepped through the east opening into the carpet room and reached a position to see Evans and defendant when the first shot was fired. He heard defendant say something, to which Evans replied, but he did not understand what was said by either. Evans then got up from his chair, and had not more than attained an erect position—perhaps not that—when defendant extended his hand and fired. Evans had not stepped forward, though perhaps he had partially turned his body, when the first shot was fired. The witness immediately backed out of the room, and did not see Evans fall. He saw nobody in the carpet room except Evans and defendant. At this point the defendant's counsel asked the witness if, a few minutes after the shooting, he did not tell Finch, in the presence of McKnight, that the "damned lie" passed between Evans and defendant, and that when Evans called defendant a damned liar he got up from the chair and took two or three steps towards defendant with his right hand down back of his body? The witness replied that he had never made such a statement to anybody. He told Daggett in Finch's presence that he believed, but was not certain, and could not state it as a fact, that Evans gave defendant the damned lie; but he said nothing about Evans getting up from his seat and stepping towards defendant with his hand behind him.

Henry Finch for the defense testified that he heard the witness Harris

make a statement to Daggett a few minutes after the killing. Harris told Daggett that he was present and saw the first shot fired; that one or the other of the parties—he did not know which—passed the damned lie; that Evans then got up, when defendant told him not to advance, but that he did make a move, when defendant commenced shooting. The court instructed the jury that the testimony of this witness could be considered for no other purpose than to contradict the witness Harris.

The defendant testified in his own behalf as follows: "Between 9 and 10 o'clock Mr. Evans came down into the store and commenced talking with me. He asked me how the stock was, and a good many other questions. He then said: 'Mr. Davis, I don't think I will need your services any longer than the 15th—and this is not all; I have it from the very best information that you have been too intimate with a lady here in the house.' I said, 'Mr. Evans, what lady is that?' He said, 'It is enough for you to know that you quit on the 15th,' and walked off. I did not see Mr. Evans any more until the afternoon. After dinner I walked up and down the aisle several times, and King asked me, 'Judge, what is the matter with you?' I said, 'Terry, some one in this house has been slandering me, and I will give him the mischief if I find out who it is.' The first time that I saw Mr. Evans he was behind the dress goods counter talking to some one—I forget who—and I passed on down; passed by the counter two or three times, and walked into the carpet room a time or two, and when I saw him then I asked him, 'Mr. Evans, I think I have a right to know what lady you have reference to, sir.' He said, 'Davis, you know well enough who I have reference to; and Mrs. —— and Miss ——— are no better.' I said, 'Mr. Evans, if you make that accusation you are a liar.' He said, 'You are a G—d d—n liar,' and then he raised up, advanced toward me, threw his hand to one side as though to draw a pistol, and I commenced shooting. Mrs. ——, besides those I have mentioned, was in the employ of the B. C. Evans Company. She and I were engaged to be married at that time, and had been for a long time. She has been in the house about three years. I expect that she is still there; at last accounts she was. I have not seen her since. I have not opened my mouth before about this. I never mentioned a word of this to her."

To contradict the defense witness Harris by showing that he was not, as he testified, in the carpet room when the first or any other shot was fired, the State introduced several witnesses who testified that they were in the immediate neighborhood of the Evans Company building when the shooting began, and went at once to the carpet room. None of them saw any person go into the store just before the first shot, nor come out just afterwards, and none of them saw any person in the front part of the carpet room immediately after the shooting, other than Evans and defendant.

*Geo. Clark, S. C. Upshaw, W. M. Perrill* and *B. G. Johnson,* for appellant, on motion for rehearing.—In affirming the judgment in this case this court bases its decision upon the rule laid down in Bishop's case, decided in 43 Texas, 390, stating that the rule laid down is "that if the omission in the charge is a material error, calculated to injure the rights of the defendant, though not excepted to at the time, nor a special charge asked, the judgment will be reversed." That is the general rule, presenting as the ultimatum the question "whether the error was material or calculated to injure the rights of the accused;" and we are willing to stand by that rule in this case, and if we do so this case will finally be reversed on rehearing.

Yet we must not forget that the Bishop case itself draws a strong line of distinction between a defective charge actually given by the court on the question at issue, and a total failure of the court to charge on the question at all, because the statute requires the court to charge "all the law applicable to the case" in some form or another, and charging in bad form or inapt terms is quite a different thing from failing to charge the law at all on the question at issue. Let us examine the Bishop case a moment, and quoting its exact language we will prove our position true. Bishop was tried for theft of an animal. There was some evidence tending to show that Bishop took the animal under an honest mistake of ownership. The court failed to charge the jury as to that issue, and the defendant did not except to the omission nor request a special charge, nor did he make it a ground for a new trial. The Supreme Court, however, reversed the judgment in the Bishop case, using the following language, which we quote literally from the decision:

"It is proper to notice another error apparent upon the record in order to prevent any misconstruction of the rules that have been announced in connection with the rule by which this court is governed in its action, where there is a failure on the part of the court below to charge the law applicable to the case, as required by the Code, and where it has neither been excepted to at the trial nor attempted to be remedied by a special charge, nor made a ground for new trial."

After stating that there was some evidence tending to show that the animal was taken in good faith by Bishop, and that the court had failed to charge upon that theory of the case, the court continues its decision in these words:

"The evidence tending to establish such a defense in this case required such a charge to be given in some shape or other under the article of the Code which requires that 'the judge shall deliver to the jury a written charge, in which he shall distinctly set forth the law applicable to the case,' and being entirely omitted when so made necessary by the evidence adduced on the trial, its omission appearing of record on appeal, must be held to be a good ground of error by this court, although the charge in

this respect was not excepted to at the time of the trial nor objected to in the motion for new trial."

This is the exact language of the Supreme Court in the Bishop case, as printed on page 398 of 43 Texas Reports, and by this rule this case should be reversed, because the Court of Appeals agrees with us that there is evidence in the record tending to show murder in the second degree, and that the court below "entirely omitted" to charge the. law applicable to the case as made by said evidence.

Will it be contended now that it is not material error to entirely omit to charge on murder in the second degree when it is admitted that there is evidence in the record tending to show murder in the second degree? The Court of Appeals states in the decision in this case that if the court had charged on murder in the second degree "it is possible that the jury may have believed that appellant's theory was true," and that "it is possible that they may not have believed that defendant Davis provoked the difficulty to have a pretext to slay the deceased," and that "it may be possible that murder in the second would have been the verdict." This is true, and the rule is thus laid down by the Supreme Court in the Luke Edmonson case, 41 Texas, 499, top lines: "It is error to charge the jury that they must either convict of murder in the first degree or acquit, if by any possible legitimate construction of the evidence the jury might have found the defendant guilty of murder in the second degree." Open the book, and your honors will read it there.

This honorable court, the Court of Appeals, also uses the following language in deciding the Conner case, reported in 23 Court of Appeals, 378, second paragraph, opinion by Judge White: "A failure to define murder in the second degree in a case where the jury upon the evidence might have found the defendant guilty of the less offense will be cause for reversal, whether the instructions were asked or not."

Code of Criminal Procedure, article 677, is in these words: "After the argument of any criminal cause has been concluded, the judge shall deliver to the jury a written charge, in which he shall distinctly set forth the law applicable to the case." This court has decided that the term "the law applicable to the case" means "the law as applicable to every legitimate issue arising from the evidence." Cooper v. The State, 22 Texas Ct. App., 419; Parker v. The State, 22 Texas Ct. App., 105.

In the case of West v. The State, 2 Texas Court of Appeals, 209, and Williams v. The State, 18 Texas Court of Appeals, 409, this honorable court held that the failure of the court below to give a written charge in a felony trial was necessarily a material error and calculated to injure the rights of the defendant, though it was not excepted to, and the cases were reversed on that ground alone, because the statute required the judge in all felony cases to deliver to the jury a written charge upon law applicable to the case.

This honorable Court of Appeals has also decided in nearly a hundred cases that "a defendant is entitled to a charge from the court upon all the issues which arise upon the evidence, so that the jury will not ignore his defenses; and however improbable his evidence may seem to the trial court, it is his right to have its truth or falsity determined by the jury, without being forestalled by the charge of the court." See Willson's Crim. Stats, sec. 2238, p. 194, and the large number of Court of Appeals decisions there cited by Judge Willson, of the Court of Appeals.

To show that this court has misconstrued the ruling in the Bishop case and overlooked the former decisions of the Court of Appeals on this question, we quote the following language from the written opinion delivered in this case, to-wit:

"The plain, simple truth is that an honest, conscientious man can not read this record without concluding that the appellant's version of this case was sheer fabrication; but it may be insisted by counsel for appellant that his version may be true, and that he may not have provoked the difficulty or produced the occasion for the purpose of killing deceased, and hence that this was a question for the jury; that the jury should have been permitted under proper instructions to pass upon the matter; that while the jury may not have believed he acted in self-defense, they may have believed his version of the facts and found him guilty of murder of the second degree. It is possible that the jury may have believed that appellant's theory was true, and it is possible that they may not have believed that he provoked the difficulty or produced the occasion to have a pretext to slay the deceased, and it may be possible that murder in the second degree would have been the verdict; but there was not the most remote probability the jury would have done any of these things, and there is not the slightest probability that appellant was injured by the omission to charge on murder in the second degree." That is to say, that the defendant's evidence tends to show murder in the second degree, and the jury might have believed his evidence to be true, and might have returned a verdict of murder in the second degree, yet that the court was justified in failing to submit his evidence to the jury in the charge because the court believed his evidence to be fabricated. This is contrary to the decision in the Bishop case itself, because the Supreme Court in deciding that case uses this language: "As to the last part of the proposition, it is not correct, because many improbable things actually do occur, and when detailed in evidence as part of any matter under investigation they are not to be discarded from the consideration of the jury because they are improbable. The improbability of a statement of a witness may diminish his credibility, but there is no rule of law prescribing that all improbable statements of a witness must be discarded from the consideration of the jury in arriving at the truth of the matter because they are improbable." Bishop v. The State, 43 Texas, 394, lines 14–23.

As to the proposition that the court below was justified in ignoring the defendant's evidence because the court believed his evidence to be "fabricated," we find the following language used by our Court of Appeals, Judge Clark delivering the opinion, in the case of Reynolds v. The State, 8 Texas Court of Appeals, 412: "It may often happen that the testimony in defense has been fabricated, and that so inartistically as to bear upon its face an air of improbability or actual untruth; but even then the court is not relieved from the duty of considering it in framing his charge, as it is the right of the defendant to have its truth or falsity determined by the jury, and not by the court in the first instance. In view of all the evidence elicited on the trial, it is more than probable that this defense, even under a proper instruction, would have had no appreciable effect with the jury, and would have been discarded altogether by them in reaching their conclusion. But that was not a question for the determination of the court below, and can not be with this court on appeal. The provinces of court and jury are plainly and rigidly defined by law, and it is not for the court to act upon the belief that the jury can not be affected by any particular portion of the evidence. Possibly they (the jury) may entertain an altogether different view of the evidence, as is their undoubted prerogative under the law."

Judge White, who was then and is still the presiding judge of our Court of Appeals, concurred in the above opinion, and the rule has never been changed and is still the law. It being admitted by the court that the defendant's evidence in this case tended to show murder in the second degree and that the issue was thus raised, and that the jury may have believed his evidence, it follows that the omission to charge on the issue was material error, calculated to injure the rights of defendant. Judge Hurt, of our Court of Appeals, held this to be the true rule in his decision of the Vincent case, in which the defendant was charged with theft of an animal, and relied upon the evidence of one witness to show a purchase of the animal as a defense.    9 Texas Ct. App., 303.

Judge Hurt, in deciding that case, in which no exception was taken to the charge nor special charge asked, uses this language: "The facts proved by the defendant tend to the formation of an issue on the purchase by defendant. The failure to give the defendant a square, clean cut charge upon that issue would strongly tend to eliminate it from the consideration of the jury, which would be calculated to injure the rights of the defendant," and for this error the case was reversed, the court stating that the omission in the charge was not excepted to, nor a special charge asked on the question.

This rule laid down by Judge Hurt is in keeping with the decision in the Bishop case, and is the true rule, and upon a reconsideration by the Court of Appeals we sincerely believe that under this rule this case will be reversed, as the Davis case is clearly within this rule, the issue of

murder in the second degree being raised by the evidence and not charged upon by the court.

By an examination of the decision of the Court of Appeals on the motion for a rehearing in the Blocker case, reported in 27 Texas Court of Appeals, 40–43, it will be found that the necessity of charging upon different degrees of an offense is much stronger than that of charging upon collateral issues that may incidentally arise upon the trial, because all the degrees are charged by the indictment, and it being the statutory duty of the jury to fix the degree of the offense by naming it in their verdict, the trial court can not charge the jury to find the highest degree if there be any evidence whatever tending to grade the offense to a lower degree.

The Blocker case is the only case ever decided by the higher courts of the State of Texas in which this distinction has been drawn, and the rule in the Blocker case has never been assailed, modified, nor changed.

Judge Willson delivered the opinion of the court, Judge Hurt and Presiding Judge White concurring in the opinion. We quote the following language of the court in that opinion, to-wit:

"It is only where there is no evidence tending to establish a particular grade of the offense that a charge as to such grade may be omitted; and in a murder case, if by any possible legitimate construction of the evidence the jury might convict of murder in the second degree, the law of that degree must be given in the charge to the jury. Instances are comparatively rare in which such a charge may be properly dispensed with. It is only where there is no evidence tending to present that issue that such a charge may be omitted."

The above decision was called forth by the able brief filed for Blocker by his distinguished counsel, Crawford & Crawford and R. D. Harrell, who took the broader ground that as the statute requires the jury in all murder trials to find and state in their verdict the degree of murder in case of conviction, the court could in no case properly fail to charge upon both the degrees of murder. Their most excellent and cogent brief is printed in full in the report of the Blocker case, beginning on page 31 of the 27 Texas Court of Appeals Reports, and it is worthy of the study of all true lawyers who have a higher regard for the purity of the law than they have for the outcroppings of the crude and uncultured minds that are generally the illegitimate parents of clamoring public opinion.

In passing upon said proposition in the Blocker case, "that the court should in all murder trials charge upon the two degrees of murder," Judge Willson uses the following language:

"We have been profoundly impressed with the strength of the reasoning advanced in support of this proposition. Article 607 of our Penal Code provides: 'If the jury shall find any person guilty of murder they shall also find by the verdict whether it is of the first or second degree;

and if any person shall plead guilty to an indictment for murder, a jury shall be summoned to find of what degree of murder he is guilty; and in either case they shall also find the punishment.' This provision is imperative, and a verdict of guilty of murder without specifying the degree of murder of which the defendant is found guilty is a nullity. It unquestionably confers upon the jury the power to fix the crime in the second degree, when it ought, under the law and facts, to be fixed in the first. This power of the jury to find the degree is unrestricted, and can not be controlled or abridged by the charge of the court, or by the omission of the court to submit in the charge to the jury the issue of murder in the second degree."

Judge Willson, proceeding on the same line, says further: "In accordance with the writer's views, it has been held in other States, under statutes similar to ours, that the court can not deprive the jury of their power and right to fix the degree by imperatively instructing them that if they find him guilty they must find him guilty of murder in the first degree. Such an imperative instruction is regarded as an unwarranted assumption of the province of the jury, and will vitiate a conviction of murder in the first degree. In this State, however," continues Judge Willson, "the decisions are numerous and uniform, holding that where there is no evidence from which by any possible legitimate construction the jury could conclude that the homicide was murder in the second degree, the charge as to the second degree may be omitted. It is only where there is no evidence tending to present that issue that such a charge may be safely omitted."

This decision was concurred in by Judge Hurt and Presiding Judge White, and is the settled law of this State. And it will be shown by the certificate of the clerk of the Court of Appeals that the charge in the Blocker case was not excepted to nor a special charge requested. We have quoted so much of the language of the above opinion to show that the Blocker case is not in conflict with the Bishop case nor with the Vincent case, but that the principles enunciated in the Blocker case are more applicable to the Davis case now at bar than either of the two cases named, because the Blocker case was a murder case involving the two degrees of murder, while both the Bishop and the Vincent cases were theft cases in which there are no degrees to be passed upon by the jury. Therefore, the principle of charging on the different degrees of the offense are not mentioned either in the Bishop or Vincent case, while in the Blocker case no other question was involved; and upon this point alone the Court of Appeals, after once affirming a judgment of murder in the first degree, granted the rehearing and reversed the judgment in the Blocker case.

In our case—the case at bar—it is admitted by the court in the written opinion affirming the case that there is some evidence in the record tending to present the issue of murder in the second degree, and

that the defendant's evidence may have been believed by the jury, and that the jury may have found a verdict of murder in the second degree if the court had charged on murder in the second degree, and this brings it squarely within the decision in the Blocker case; and we feel in our hearts that after a mature consideration of this question the final decision of your honors in this case will be in accordance with your decision in the Blocker case, for no lawyer can say that it is not the true rule.

*W. L. Davidson,* Assistant Attorney-General, for the State.

*H. M. Furman,* also for the State, filed an able and exhaustive brief on the original hearing and in the reply to the motion for rehearing.

Hurt, Judge.—This is a conviction for murder of the first degree, the penalty being death.

Counsel for appellant make thirty-six assignments of error. We have had the benefit of argument in support of several of these supposed errors, and we have carefully read the record and the brief for the appellant. The conclusion reached is that there is no such error in this record as requires a reversal of the judgment.

We desire to discuss but one question—for to discuss all of the assignments would require the writing of a small volume, which we have not the time to do—remarking, however, that each assignment has received our most careful examination.

To support the conviction the State relies upon two aspects of the case, and contends that if either be true the judgment should stand. These aspects are:

First. That Evans was sitting in a chair reading a newspaper when appellant approached him, spoke to him, and before Evans arose, with the paper still in his hand, fired and killed him.. That the killing was with a calm, sedate mind and formed design.

Second. That, conceding appellant's version to be true, to-wit: "That between 9 and 10 o'clock of the morning of the homicide deceased came into the store and commenced talking with Davis, and said to him, 'Mr. Davis, I don't think I will need your services any longer than the 15th— and this is not all; I have it from the very best information that you have been too intimate with a lady in the house;' that defendant replying, asked, 'What lady is that, Mr. Evans?' Evans replied, walking off, 'It is enough for you to know that you quit on the 15th;' that defendant proceeded to wait on customers; that in the afternoon, Evans being in his office sitting in a chair, defendant went to him and said, 'I think I have a right to know what lady you have reference to.' Evans answered, 'Davis, you know well enough who I refer to; and Mrs. —— and Miss —— are no better;' that defendant answered, 'Mr. Evans, I say if you make

that accusation you are a liar!' that Evans replied, 'You are a God damned liar!' raised up and advanced towards defendant, throwing his hand to one side as if to draw a pistol, when Davis shot him:" admitting, we say, that the above facts are true, the State contends that then other facts and circumstances *demonstrate* that appellant sought Evans, revived this matter relating to the women for the purpose of provoking a difficulty in order for a pretext to kill Evans; that with a cool, calm, and deliberate mind the provocation was given, or the occasion was produced, and hence there was no murder of the second degree in the case.

We have thus stated the positions of the State with a view to the discussion of the only question we desire to notice.

Under the state of case presented by the testimony of the appellant his counsel contends that the court should have submitted the question of murder of the second degree. Was it in the case? Counsel insists that it was, and that hence there was error in the charge because it failed to submit that degree of homicide to the jury. The learned judge submitted the question of self-defense, but only one degree of murder—the first. There was no objection to the charge for this omission, nor did counsel request an instruction upon the second degree. We have reversed a great number of judgments, in all manner of felony cases, for this omission, though there was no charge requested, nor objection because of the omission to charge the law applicable to the different phases of the case. But in the absence of requested charges or objection for the omission, what is the rule? We are discussing the matter upon the hypothesis that murder of the second degree is presented by some evidence in the record. The rule is stated in Bishop's case, 43 Texas, 390, to be that if the charge is erroneous and is excepted to at the time, the judgment will be reversed. But though erroneous, if not excepted to or proper instructions requested, the judgment for this error may or may not be reversed. If the omission was a material error—one calculated to injure the rights of the defendant—though the error is called to the attention of the court first in a motion for new trial, the judgment should be reversed.

But in determining whether the error is material and calculated to injure the rights of the accused we are to look to the whole record bearing upon the subject. What was the nature of the testimony supporting the verdict? Was it cogent and overwhelming? What the character of the testimony presenting the phase or theory of the case omitted to be noticed in the charge, and upon which omission error is assigned? Was it at all reasonable? Did it present a theory which a reasonable mind could entertain, or was it supported by such testimony as was remotely calculated to destroy the State's case, when considered in connection with the other testimony in the case as well as the charge as a whole? Was the phase of the case simply an addition to the case as made by the State, and consistent therewith, or was it in direct conflict with the State's

theory? These are all important matters to be considered in passing upon the materiality of the omission or error so as to properly determine whether the error was calculated to injure the rights of the accused.

What then was the nature of the State's evidence in support of murder of the first degree? We will not repeat the testimony, but will say that upon the first phase of the State's case it is almost absolutely demonstrated, not only by the positive evidence of several witnesses but by all the surrounding facts, that this was a calmly and deliberately planned assassination—that the appellant, with a cool and deliberate mind and previously formed design, approached Evans, who was sitting in a chair reading a newspaper, and before he could rise shot him—an unarmed man—and continued to shoot until he was in a manner dead.

Upon the second phase of the case the surrounding facts place it beyond contradiction that appellant, if what he says is true, calmly and deliberately provoked the difficulty—produced the occasion—with but one single purpose, and that was to obtain a pretext to slay the deceased. All of the facts not only tend this way, but form a mighty torrent moving irresistibly to this conclusion.

Now, then, this being the nature of the evidence in support of the second phase of the case contended for by the State, we can concede that what the appellant swears is true, and still, as he calmly and deliberately adopted this method to provoke the difficulty or produce the occasion with intent to slay his victim, there is not only no self-defense in the case but there is no murder of the second degree; and in view of the facts—the cogency of the facts—the overwhelming conclusiveness of the facts in support of murder of the first degree—if a charge had been submitted permitting the jury to find a less degree, no juror with the least degree of intelligence, unless corrupt, would have entertained for a moment the suggestion of any theory less than murder of the first degree. The plain, simple truth is that an honest, conscientious man can not read this record without concluding that appellant's version of this case was sheer fabrication.

But it may be insisted by counsel for appellant that his version *may* be true, and that he may not have provoked the difficulty or produced the occasion for the purpose of killing deceased, and that hence this was a question for the jury, and that the jury should have been permitted to pass upon the matter under proper instructions; that while the jury may not have believed that he acted in self-defense, they may have believed his version of the facts, and found him guilty of murder of the second degree. It is possible that the jury may have believed that appellant's theory was true, and it is possible that they may not have believed that he provoked the difficulty or produced the occasion to have a pretext to slay the deceased, and it may have been possible that murder of the second degree would have been the verdict; but there was not the most remote

probability that the jury would have done any of these things, and hence there is not the slightest probability that the appellant was injured by the omission.

Now, if counsel for appellant had objected to the charge of the court for the omission to charge murder of the second degree, or had requested a charge upon that degree, and it had been refused, there being some evidence tending to present this degree of homicide, we might have been required to reverse the judgment. This, however, is quite doubtful, because appellant's theory of the case tends only to meet the State's first phase mentioned above, leaving the second position of the State unquestioned—that is, that appellant calmly, deliberately, and very cautiously provoked the difficulty or produced the occasion for but one purpose—to kill the deceased.

As above said, we have very carefully examined the record in the light of the argument and brief of counsel for appellant, and in view of the awful verdict and judgment in this case; but we have failed to find an error requiring a reversal of the judgment. We have discussed but one question in the record, but we have given to all the others a most careful consideration, and we do not believe any of the assignments present an error for which the judgment should be reversed, and the judgment is therefore affirmed.

*Affirmed.*

Judges all present and concurring.

[The foregoing opinion on the original hearing of this appeal was delivered at the Tyler Term, on December 12, 1889. The motion for rehearing filed by the defense was taken under advisement, transferred to Galveston, and thence to Austin, and was finally disposed of by the opinion which follows, on June 4, 1890. The case is now reported as of the Austin Term.—Reporter.]

## On Motion for Rehearing.

Hurt, Judge.—We have read carefully the motion and brief thereon, and have listened with pleasure and interest to the arguments for and against the same.

As in the first opinion, so in this, we will discuss but one question—all the other supposed errors being met by the brief for the State.

As there is some evidence tending to reduce the offense from murder of the first to murder of the second degree, though its force be ever so weak, trivial, or light, counsel for the motion contend that it is not only the duty of the court below to instruct the jury on the lesser degree, but

that failure to so instruct is reversible error whether or not the omission was objected to at the time.

We concede that under such a state of case it would be the duty of the court to charge on murder of the second degree, because this is required by the statute. But as there were no objections made to the charge (because of this omission) at the time, so as to bring the case within the provisions of article 685 of the Code of Procedure, does it follow that the judgment must be reversed whether the defendant excepted to the charge or not? This is the question; and we understand that counsel for the motion assume the affirmative, contending that if there be any evidence tending to present murder of the second degree or any degree of homicide less than murder of the first degree, the judge must charge on the less degree or degrees whether requested or not, and that a failure to do so will work a reversal of the judgment, though the charge was not excepted to at the time.

If this proposition be correct the party who fails to except to the charge occupies a position as favorable as would one who objects. Diligence in bringing forward the objection at the earliest opportunity has no reward— the careful and the diligent and the careless or negligent standing on the same plane.

In this connection we call attention to the opinion of Roberts, C. J., in Bishops's case, 43 Texas, 390. He says: "This difference in the rule, dependent upon the time when the objection to the action of the court is made, is in harmony with the rules of judicial proceedings generally, that a party who makes an objection at the proper time, which is usually the first practical opportunity, shall have his objection more favorably considered than if it had been inopportunely delayed." In the above the Chief Justice is wrong if the counsel is right.

The statute, as is well known to the profession, provides that if there be error in the charge in a felony case, and it is excepted to at the time of the trial, the judgment should be reversed. But suppose there be error and the accused fails to except, will the judgment be reversed in all such cases? By no means. We will let Chief Justice Roberts state the rule applicable to such a state of case: "It is to be particularly noticed that the record shows, and properly by a bill of exception shows, in this case, that this charge was excepted to by defendant's counsel at the time of the trial, and before the case had been submitted to the jury, and before they had retired to consider of their verdict; and that thus an opportunity was given to the judge to correct or withdraw the charge if he had deemed it to have been improper, upon a reconsideration of it then made before the final submission of the case to the jury. This, in reference to the provisions of our Code of Criminal Procedure, will be found to be an important consideration in this case on appeal to this court, by the exceptions having been made, and shown by the bill of exceptions to have

been made at the time of the trial, and to be much more beneficial to the defendant than if not then made, but made only afterwards on a motion for a new trial."

"If such a charge is not excepted to at the time of trial, but is presented in a motion for new trial, which is the next point at which it could be presented, then its consideration by this court would be subject to another and a very different rule, which would be whether or not such charge was an error which, under all the circumstances, as exhibited in the record, was 'calculated to injure the rights of the defendant,' and which is prescribed as one of the grounds for the granting of a motion for a new trial, in the following language: 'Where the court has misdirected the jury as to the law, or has committed any other material error calculated to injure the rights of the defendant.'"

Of what degree of force must the evidence be that tends to establish an offense, or tends to mitigate the offense charged in order to require a charge applicable thereto? Chief Justice Roberts says that if its force is deemed to be very weak, trivial, or light, and its application remote, "the court is not required to give a charge upon it." "If, on the other hand, it is so pertinent and favorable as that it might be reasonably supposed that the jury could be influenced by it in arriving at their verdict, the court should charge so as to furnish them with the appropriate rule of law upon the subject." Bishop v. The State, 43 Texas, 390. Hence, unless the evidence tending to present a less degree of an offense, or any theory of defense, be so pertinent and forcible that it might be reasonably supposed that the jury could be influenced by it in arriving at their verdict, a failure of the court to charge thereon would not be ground for reversal in the absence of exceptions.

This position is in exact harmony with the first opinion in this case, and in accord with Bishop's case, *supra,* and a number of cases decided by this court, notably Cunningham's case, 17 Texas Court of Appeals, 87; Elam's case, 16 Texas Court of Appeals, 34; and Leeper's case, decided at the present term, but not yet reported. See also Johnson's case, 27 Texas, 758.

Loose expressions upon this subject can be found in the opinions of this court, but the principle is well settled and is absolutely correct, whether this court has always adhered to it or not, that in the absence of exceptions to the charge of the court, for this court to reverse, the evidence tending to present a phase of the case or theory favorable to the accused must be so pertinent and favorable that it might reasonably—*not* possibly—be supposed that the jury could be influenced by it in arriving at their verdict. Unless the evidence be of such a character no injury appears, no injury is probable—not possible, but *probable*—and unless this appears there is no ground for reversal; and to reverse in the absence of probable injury would be contrary to principle. This would be the rule as to error in the charge of the court though excepted to, but for the statute.

Was the evidence presenting murder of the second degree of such force and pertinency as to render it reasonably probable that the jury would have been influenced thereby in arriving at their verdict? As there was no exception to the charge this is the vital question. The counsel for the motion in their argument carefully avoided a discussion of this question when it was the very issue for discussion, and to determine this issue the facts must be carefully examined. When these are consulted, instead of presenting murder of the second degree with such force and pertinency as would render it reasonably probable that the jury would be influenced thereby in arriving at their verdict, when taken as a whole, this degree of homicide is very feebly or lightly indicated. This being the case no injury is probable, and hence no reversible error is made manifest.

We are of the opinion that there is no reason why the motion for rehearing should be granted, and it is therefore overruled.

*Rehearing refused.*

Judges all present and concurring.