Lee W. SANSOM, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 14-06-00890-CR, 14-06-00891-CR.

Court of Appeals of Texas, Houston (14th Dist.).

March 4, 2008.

Discretionary Review Refused Nov. 5, 2008.

Roland Brice Moore III, Houston, for appellant.

Carmen Castillo Mitchell, Houston, for appellee.

Panel consists of Justices YATES, FOWLER and GUZMAN.

## MEMORANDUM OPINION

WANDA McKEE FOWLER, Justice.

Appellant, Lee W. Sansom, was indicted on the offenses of indecency with a child by contact and aggravated sexual assault of a child. The jury returned a guilty verdict, and the trial court sentenced appellant to four years' confinement on the indecency charge and ten years' confinement on the sexual assault charge, with the sentences to be served concurrently in the Texas Department of Criminal Justice, Institutional Division. On appeal, appellant challenges the trial judge's limitation of the scope of cross-examination of two prosecution witnesses, as well as the trial judge's failure to submit a reasonable doubt instruction on extraneous offenses in the jury charge on punishment. We affirm.

### Factual and Procedural Background

C.S. and J.A., the complainants, lived with their two older sisters, their mother, Margarita Arcos ("Arcos"), and appellant, their stepfather. In 1997, Arcos and appellant were married, and appellant thereafter moved in with Arcos and her four daughters. At that time, C.S. was seven years old, and J.A. was five years old. Their apartment had two bedrooms: the first, where Arcos, appellant, and J.A. slept,[1] and the second, where C.S. and her older sisters slept.

At trial, the complainants testified that appellant's sexual abuse commenced in 1999, when C.S. was nine years old, and J.A. was seven years old. Both testified as to the charged offenses, as well as to offenses not alleged in the respective indict-

---

1. Although J.A., Arcos, and appellant shared a bedroom, the record indicates that J.A. slept in a separate bed in this bedroom.

ments; the details of each are provided fully below.

**Disclosure of Appellant's Conduct**

Neither C.S. nor J.A. themselves initially informed the authorities of the sexual abuse. Nor did they discuss the abuse with members of their immediate family or each other, except for J.A.'s disclosure to C.S. sometime in 1999. C.S. testified that she told her cousin, Tatiana, of appellant's conduct in October 2005, shortly before being baptized. Although C.S. asked her not to tell anyone that she had been molested by appellant, Tatiana told her mother, Concepcion (Arcos's sister-in-law), who then informed Arcos of appellant's conduct. On October 11, 2005, Concepcion and Arcos filed a police report, and C.S. and J.A. were each interviewed by Ivee Syon ("Syon") of the Children's Assessment Center ("CAC") on October 20.

During their respective interviews, C.S. and J.A. detailed the manner in which each had been sexually abused by appellant. The interviews were videotaped, and Syon herself was called to testify at trial as the outcry witness. Her trial testimony indicated that J.A. had initially been scheduled for an interview by Syon only as a precaution: siblings of sexual abuse victims are typically interviewed "just in case," and there had been no indication that J.A. had been molested when her interview was initially scheduled. In fact, Syon testified that J.A. "didn't know how anyone knew" before her disclosure of appellant's inappropriate touching to Syon.

**Legal Proceedings**

Officer Kim Barnes ("Barnes") of the Houston Police Department initially contacted appellant on October 26, 2005, and informed him of the allegations made against him. On January 11, 2006, appellant was formally indicted on the charges of indecency with a child by contact, and aggravated sexual assault of a child under fourteen years of age. Appellant pleaded not guilty, and the charges were consolidated for trial. At trial, the State elicited testimony from C.S. and J.A. regarding the incidents of sexual abuse detailed below, several of which were not specifically alleged in the charging instruments. Appellant proffered the theory that C.S. and J.A. had fabricated the charges against him, in retaliation for his seeking to divorce Arcos, and in response to his being a strict disciplinarian. However, the trial judge prevented appellant from inquiring into Arcos's citizenship status on cross-examination, as well as alleged discipline problems with C.S., which, as appellant urges, form the basis of his defense, and which we address more fully below. At the close of the guilt/innocence phase, the jury received a reasonable doubt instruction for the extraneous offenses, and found appellant guilty on both counts.

During the punishment phase, appellant presented two witnesses; the State presented one witness, and reoffered all the evidence from the guilt/innocence phase of trial. The charge instructed the jury that the range of punishment was from two to twenty years on the indecency count, and five years to life on the sexual assault count, both of which could be probated if the jury desired. The charge reminded the jury of the State's burden of proof, but it did not inform the jury that it could consider the extraneous offenses only if it found beyond a reasonable doubt that appellant committed them. Appellant did not object to the failure of the charge to contain a reasonable doubt instruction. The jury assessed punishment at four years' imprisonment on the indecency count, and ten years' imprisonment on the sexual assault count, with the sentences to be served concurrently.

**Issues on Appeal**

On appeal, appellant contends that the trial court erred in (1) improperly limiting

the scope of cross-examination of two prosecution witnesses, the effect of which was to deny him the right to present a defense; and (2) not submitting a reasonable doubt instruction on extraneous offenses in the jury charge on punishment.

### Analysis of Appellant's Issues

### I. Improper Limitation of Cross–Examination

In his first issue, appellant contends that the trial court violated his Sixth Amendment rights when it improperly limited the scope of his cross-examination of two prosecution witnesses, Arcos and C.S. The trial court refused to allow appellant to cross-examine Arcos about whether she was a citizen of the United States, and refused to allow cross-examination of C.S. regarding specific instances of her misconduct and related discipline problems. Appellant argues that, by limiting the scope of his cross-examination of each, the trial court "individually shield[ed] them from any effective cross-examination as to their possible motives for fabrication," which resulted in "the complete evisceration of his defense," and the "denial of a fair trial" to appellant. We disagree.

### A. Appellant Preserved Error on the Issue

As a preliminary matter, the State contends that appellant failed to preserve error on this issue. However, we disagree. When a trial court denies the defendant the opportunity to question a witness for the State in the presence of the jury about an entire subject matter that might have shown the witness lacked credibility, such as malice, ill will, motive, or bias, error is preserved when defense counsel states the subjects on which he intends to question the witness. *Ho v. State*, 171 S.W.3d 295, 304 (Tex.App.-Houston [14th Dist.] 2005, pet. ref'd) (quoting *Stults v. State*, 23 S.W.3d 198, 204

(Tex.App.-Houston [14th Dist.] 2000, pet. ref'd)). Here, appellant sought to cross-examine Arcos regarding her citizenship status in order to establish a possible motive for C.S. and J.A. to fabricate their claims against him. Similarly, appellant sought to cross-examine C.S. regarding alleged discipline problems that Arcos and appellant had with her in order to further explain C.S.'s motive to fabricate. The record reflects that appellant clearly stated the subject matter on which he intended to question each witness. Therefore, appellant has preserved this issue for review.

### B. Standard of Review and Applicable Law

We review a trial court's decision to limit cross-examination under an abuse of discretion standard. *See Matchett v. State*, 941 S.W.2d 922, 940 (Tex.Crim.App. 1996); *Ho*, 171 S.W.3d at 304. An abuse of discretion occurs when the trial court acts without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex.Crim.App.1990).

The Confrontation Clause of the United States Constitution guarantees a defendant the right to cross-examine witnesses. *See* U.S. Const. amend. VI; *Delaware v. Van Arsdall*, 475 U.S. 673, 678, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Lopez v. State*, 18 S.W.3d 220, 222 (Tex.Crim. App.2000). A defendant may cross-examine a witness on any subject "reasonably calculated to expose a motive, bias or interest for the witness to testify." *Carroll v. State*, 916 S.W.2d 494, 497 (Tex.Crim. App.1996). However, this right is not without limits. *Saglimbeni v. State*, 100 S.W.3d 429, 435 (Tex.App.-San Antonio 2002, pet. ref'd) ("Although the rights to confrontation and cross-examination are constitutionally protected, these rights are not absolute."). The trial court has consid-

erable discretion in determining how and when bias may be proved, and what collateral evidence is material for that purpose. *Ho*, 171 S.W.3d at 304 (citing *Recer v. State*, 821 S.W.2d 715, 717 (Tex.App.-Houston [14th Dist.] 1991, no pet.)). To this end, the trial court has the discretion to limit the scope of cross-examination to avoid harassment, prejudice, confusion of the issues, endangering the witness, and the injection of cumulative or collateral evidence. *Van Arsdall*, 475 U.S. at 679, 106 S.Ct. 1431; *Ho*, 171 S.W.3d at 304. This limitation does not violate the defendant's right to confront a witness so long as (1) the possible bias and motive of the State's witness is clear to the trier of fact; and (2) the accused has otherwise been afforded an opportunity for a thorough and effective cross-examination. *Ho*, 171 S.W.3d at 304 (quoting *Stults*, 23 S.W.3d at 204).

However, the Sixth Amendment should be liberally construed to give appropriate constitutional protection to the defendant. *Saglimbeni*, 100 S.W.3d at 435 (citing *Chew v. State*, 804 S.W.2d 633, 635 (Tex.App.-San Antonio 1991, pet. ref'd)). Accordingly, the Court of Criminal Appeals has emphasized that the right to cross-examination "includes the right to impeach the witness with relevant evidence that might reflect bias, interest, prejudice, inconsistent statements, traits of character affecting credibility, or evidence that might go to any impairment or disability affecting the witness's credibility." *Virts v. State*, 739 S.W.2d 25, 29 (Tex. Crim.App.1987). Moreover, any question asked of a witness on cross-examination, which might have a tendency to show the witness' credibility, is always a proper question. *Koehler v. State*, 679 S.W.2d 6, 9 (Tex.Crim.App.1984). Thus, the proper scope of cross-examination includes "all facts and circumstances which, when test-

ed by human experience, tend to show that a witness may shade his testimony for the purpose of helping to establish one side of the cause only." *Id.* (citing *Jackson v. State*, 482 S.W.2d 864, 868 (Tex.Crim.App. 1972)).

Notwithstanding the trial court's discretion in this area, jurors are entitled to have the benefit of the defense theory before them so that they can make an informed decision regarding the weight to accord the witness's testimony, even though they may ultimately reject the theory. *Maxwell v. State*, 48 S.W.3d 196, 199 (Tex.Crim.App.2001) (citing *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974)).

### C. Application of the Law to the Facts

#### 1. Cross–Examination of Arcos

##### a. The Trial Court Abused its Discretion

We conclude that the trial court's limitation of appellant's cross-examination of Arcos regarding her citizenship status violated appellant's confrontation rights, and thus constitutes an abuse of discretion. Appellant's defense theory was premised, in part, on the citizenship status of Arcos and the timing of the sexual abuse allegations in relation to a telephone conversation between Arcos and appellant regarding the subject of divorce in October 2005. Appellant sought to question Arcos regarding her citizenship status, in an attempt to demonstrate to the jury that, since Arcos would presumably face deportation in the event of divorce, C.S. and J.A. fabricated the sexual abuse charges against appellant to dissuade him from seeking a divorce. Appellant attempted to cross-examine Arcos regarding her citizenship status in the United States, only to have the trial judge sustain the State's objection as to relevance:

[Defense counsel]: Are you a citizen of the United States?

[Arcos]: No sir.

[The State]: Objection, relevance.

[The Court]: Sustained. Ma'am, when you hear an objection, wait to answer the question. Disregard the question and the answer.

[Defense counsel]: Your Honor, may I approach the bench, please?

[The Court]: Yes.

[Defense counsel]: These questions I'm going to ask about being a citizen of the United States goes to the weight of my case.

[The Court]: How so?

\*　　\*　　\*

[Defense counsel]: She does not want a divorce from [appellant] because she's afraid of going back to Colombia. This is part of something that—the reason we are having some of the problems, also.

[The Court]: What does that have to do with whether your client sexually assaulted these girls?

[Defense counsel]: They already indicated to [appellant] if he divorced or try (sic) to leave their mother, they were going to do something to hurt him and this is part of it.

\*　　\*　　\*

[The Court]: But what's it got to do with the girls? That's what I don't understand, what it has to do with the case?

[Defense counsel]: When he approached her in October of 2005 about a divorce is when all this stuff started. That's when it all started.

[The Court]: So you're saying the girls are lying because of what?

[Defense counsel]: Because they—

[The Court]: Does it have to do with her citizenship?

[Defense counsel]: They are afraid their mother is going to get sent back to Colombia if she gets a divorce.

[The Court]: So by saying he sexually assaulted them, he is not going to get a divorce now?

[Defense counsel]: You got it. You got it on tape, too, Judge.

[The State]: No, I don't have it on tape. I have never heard that.

[Defense counsel]: He talked with Officer Barnes about it.

[The State]: He did say in the statement to Officer Barnes that I plan on introducing into evidence that C.S., when she was six, told him if you leave us—

[The Court]: When she was six?

[The State]: When she was six, she stated to him that if you leave us, I will call the police and tell them you touched my middle part. You can be free and live with us or you can get a divorce and go to jail. That's what essentially he says she said when she was six years old. There is nothing about them getting a divorce in October of '05. There is no divorce filed. He hasn't filed a divorce.

[The Court]: I'm sustaining the relevance at this point. I don't see it at all.

[Defense counsel]: Note our exception. I hope you get it on the record.

Later, on direct examination, appellant attempted to testify regarding the citizenship status of Arcos, only to have the trial judge again sustain the State's objection on relevance grounds:

[Defense counsel]: Now, when you married Ms. Arcos back in '97, was she a United States citizen?

[The State]: Objection, irrelevant.

[The Court]: Sustained.

[Defense counsel]: I think he can answer that.

[The Court]: No, he can't. Sustained.

[Defense counsel]: Your Honor, may I approach the bench?

[The Court]: No.

[Defense counsel]: May I have the jury removed?

[The Court]: No, sir.

The record reflects that any possible bias and motive of Arcos to testify, as would have been evinced by testimony regarding her citizenship status, was not clear to the jury. Although the trial court allowed appellant to cross-examine Arcos on the subject of divorce, the trial court did not allow appellant to inquire into the subject of Arcos's citizenship status on either cross-examination or direct examination, nor was any evidence of Arcos's citizenship status otherwise presented during trial. In fact, by limiting the cross-examination of Arcos into this subject matter, the trial court denied the jury the thrust of appellant's deportation-in-the-event-of-divorce defense theory, thus depriving the jury of the ability to make an informed decision regarding the weight to accord Arcos's testimony, even though the jury may have ultimately rejected appellant's theory. *Maxwell*, 48 S.W.3d at 199. Therefore, because any possible bias and motive on behalf of Arcos was not clear to the jury, we find that appellant's confrontation rights were violated, and it was an abuse of discretion by the trial court to limit appellant's cross-examination of Arcos regarding her citizenship status.

### b. The Error Was Harmless

■ A violation of the Confrontation Clause is subject to a harmless error analysis. *Shelby v. State*, 819 S.W.2d 544, 546 (Tex.Crim.App.1991) (citing *Van Ars-*

*dall*, 475 U.S. at 684, 106 S.Ct. 1431). In the context of improper limitation of cross-examination, the Texas Court of Criminal Appeals applies the three-pronged test established by the United States Supreme Court in *Delaware v. Van Arsdall*. *Id.* at 547. First, the appellate court must assume that the damaging potential of the cross-examination was fully realized. *Id.* (citing *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. 1431). Second, with that assumption in mind, the appellate court must review the error in connection with the following factors: (1) the importance of the witness's testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the prosecution's case. *Id.* (citing *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. 1431). Finally, in light of the first two prongs, the appellate court must determine whether the error was harmless beyond a reasonable doubt. *Id.* (citing *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. 1431).

■ Under *Shelby/Van Arsdall*, we must first assume that the damaging potential of the cross-examination was fully realized. In other words, we must assume the jury was fully informed that Arcos is not a United States citizen and apply the following five factors:

### i. The Importance of the Witness's Testimony in the Prosecution's Case

Arcos's testimony was important, but not essential, to the prosecution's case. She was not the designated "outcry" witness for the State. Moreover, Arcos testified that she never had a direct conversation with either C.S. or J.A. regarding the substance of their allegations. Nonethe-

less, Arcos provided background information about her relationship with appellant, and his relationship with her daughters, which corroborated the testimony of C.S. and J.A. Furthermore, Arcos and her sister-in-law were the persons who filed a police report regarding appellant's sexual abuse, and were also the persons who took C.S. and J.A. to be interviewed at the CAC, and her testimony regarding each corroborated that of Barnes and Syon.

### ii. Whether the Testimony Was Cumulative

Arcos's testimony was cumulative in some regards, including her description of the apartment where the sexual abuse occurred, appellant's interaction with her daughters, and her discussion with appellant in October 2005 regarding the prospects for divorce. However, her testimony was not cumulative in relation to several facts, namely her prior marriage to Miguel Arcos, the details of her relationship with appellant before their marriage, as well as the details of their sexual relationship during marriage, and her employment history and work schedule.

### iii. The Presence or Absence of Evidence Corroborating or Contradicting the Testimony of the Witness on Material Points

On every material issue, Arcos's testimony was corroborated by that of C.S., J.A., Syon, and Barnes. Moreover, her testimony regarding the October 2005 divorce conversation with appellant was corroborated by appellant's testimony on direct examination.

### iv. The Extent of Cross–Examination Otherwise Permitted

The trial court further prevented appellant from cross-examining Arcos on the following issues: (1) whether appellant had just cause to spank his stepdaughters on the occasions when he disciplined them in that manner; (2) whether C.S. skipped school; and (3) whether appellant's name was included on the lease of the new apartment Arcos and her daughters moved into in 2002. In each instance, the trial court sustained the State's objections on relevance grounds.

### v. The Overall Strength of the Prosecution's Case

■ Even without Arcos's testimony, the prosecution's case was strong overall, particularly in light of the testimony of C.S. and J.A., and appellant's failure to impeach the complainants' credibility. *See Wheeler v. State*, 67 S.W.3d 879, 888 (Tex. Crim.App.2002) (noting that most sexual abuse prosecutions hinge on credibility, because the trial is generally a swearing match between the complainant and the defendant). The State presented the testimony of the complainants, who each provided graphic accounts of the sexual abuse suffered at the hands of appellant; the complainants' mother, who described the social and sexual isolation that characterized her marriage to appellant; the police officer who contacted appellant regarding the complainants' sexual abuse allegations, who recounted that appellant failed to return her telephone call or otherwise schedule an interview with her related to those allegations; and the CAC interviewer who initially questioned the complainants, who testified that, during their respective interviews, C.S. and J.A. each exhibited behaviors consistent with child victims of sexual abuse. In contrast, appellant presented only his own testimony in his defense, and wholly failed to impeach the credibility of the most damning prosecution witnesses— the complainants themselves. Furthermore, although appellant does not here complain of factual sufficiency, it is note-

worthy that "'[t]he testimony of a child victim alone is sufficient to support a conviction for aggravated sexual assault or indecency with a child.'" *Glockzin v. State,* 220 S.W.3d 140, 147 (Tex.App.-Waco 2007, pet. ref'd) (quoting *Perez v. State,* 113 S.W.3d 819, 838 (Tex.App.-Austin 2003, pet. ref'd)).

The final step of the analysis requires us to determine, in light of the foregoing examination, whether the error was harmless beyond a reasonable doubt. *Shelby,* 819 S.W.2d at 551 (citing *Chapman v. Calif.,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). Focusing on Arcos's testimony and assuming that the jury was fully informed that she is not a United States citizen, coupled with Arcos's cumulative testimony regarding the description of the apartment where the sexual abuse occurred, appellant's interaction with her daughters, and her discussion with appellant in October 2005 regarding the prospects for divorce, and the overall strength of the prosecution's case even without Arcos's testimony, we conclude that the trial court's denial of appellant's right to cross-examination of Arcos, guaranteed by the Confrontation Clause of the Sixth Amendment, was harmless beyond a reasonable doubt. Even if appellant was allowed to cross-examine Arcos on the subject of Arcos's citizenship status, and the jury discovered that Arcos is not a United States citizen, the jury could still conclude beyond a reasonable doubt that appellant sexually abused C.S. and J.A. in the manner alleged based on the complainants' testimony alone. We therefore overrule appellant's first issue as it pertains to Arcos.

### 2. Cross–Examination of C.S.

■ We next consider appellant's complaint that the trial court limited his cross-examination of C.S. The record reflects that the trial court did not limit this cross-examination. Instead, during appellant's cross-examination of C.S. regarding alleged discipline problems he had with her, the following exchange occurred:

[Defense counsel]: Did anything happen in the car when he would take you to school?

[C.S.]: There is one time we argued.

\*　　\*　　\*

[Defense counsel]: Just argued. What would y'all argue about?

[C.S.]: When I got older, he thought I was being defiant. We argued about anything.

[Defense counsel]: Did y'all used to argue about you would take off and run away from home sometime?

[The State]: Objection, relevance.

[The Court]: Come up to the bench, please. That's sustained. Approach the bench.

(At the bench) If you want to get into anything you think this girl did—

[Defense counsel]: Ma'am?

[The Court]: You can't go into extraneous offenses regarding this girl without approaching the bench and asking me, especially regarding sex. I want to make sure you know the rules of evidence.

[Defense counsel]: Yes, ma'am. I wasn't going to ask anything about—I was going to ask what were they arguing about as far as her demeanor, ma'am, what caused them to argue. That's what I was trying to get at, why were they arguing.

[The Court]: Yeah, but if it's about anything that's going to show her to be a bad person, I'm not letting it in. I don't know what's coming.

[Defense counsel]: This is part of some of the things, Your Honor, that is going on. That's why he is sitting out

there now. That's what some of the problem was in the home.

[The Court]: ·What did they argue about?

[Defense counsel]: Because she would take off and stay out at night and everything. She would run away from home. That's what the whole thing started about.

\*        \*        \*

[The ·Court]: I'm going to grant—I'm not going to let you do that kind of thing. If you want to talk about them arguing or he was strict with her and that's why she allegedly is making this up, that's fine, but I'm not going to let you do this.

[Defense counsel]: This is where I'm getting into, this is one of the reasons he had to take her to school. She wouldn't go to school.

\*        \*        \*

[The Court]: Let me just hear the allegations that you intend to get out, that's what you want to get out, and tell me the relevance of these.

[Defense counsel]: The relevance—the question I was asking, the reason I was asking this question, sometime [appellant] was concerned because he didn't know whether or not she was going to school all the time, and that was some of the reasons that he was taking her to school. And then further on down than that, because some of this started up is why he and her mother split up, too, Judge. This is some of the same questions, because some of the actions that were being permitted—being committed by this young lady. This is what it all started about.

[The Court]: Why he was taking her to school is irrelevant. I'm not going to allow any inquiry about that. I don't

see the relevance of that at all with regard to these allegations. Whether they are split up or not, that's fine, if you want to get into that. What I'm trying to say is there is a specific rule for prior sexual conduct in here where we have to have a hearing outside the presence of the jury.

However, after a short voir dire examination of C.S. regarding a statement made to Syon during her videotaped interview, the trial judge then allowed cross-examination of C.S. on this subject:

[The Court]: All right. I'll allow you to say why did she [sic] take· you to school and not the other girls, and then you can get that out with your client.

Appellant complains here that the effect of the trial court's ruling was to prevent him from explaining to the jury the discipline problems he was having with C.S., which would, in his words, "explain that [C.S.] would be susceptible to making false accusations." Contrary to appellant's assertion, the trial court allowed appellant to cross-examine C.S. fully on the subject matter of his taking her to school following the exchange listed above, as well as on other related discipline problems. In fact, the trial court, over the State's objections, allowed appellant to cross-examine C.S. on whether she threatened to falsify charges against appellant in the event that he divorced Arcos, as well as whether Concepcion ever talked with her about not staying away from home overnight without telling anyone, namely appellant and Arcos. Following the above exchange, the only question not allowed on cross-examination pertaining to discipline problems was whether C.S. skipped school once in a while, which the trial judge deemed irrelevant. Any possible discipline problems existing between appellant and C.S. with respect to her truancy would have been disclosed

through the line of questioning allowed by the trial court on the subject of taking C.S. to school.

Furthermore, appellant elicited testimony from C.S. on cross-examination that (1) she never "played hooky" from school; (2) appellant sometimes took her, but not her sisters, to school, even though her school was closer to the apartment than those of her sisters; (3) on at least one occasion, she and appellant argued on the way to school; (4) she argued with appellant about "anything" when she got older; (5) Arcos and Concepcion called the police looking for C.S. when she was gone overnight without permission; and (6) appellant often spanked C.S. and her sisters for not following his rules. The record therefore indicates that the trial judge did not limit appellant's cross-examination of C.S. regarding discipline problems he had with her in the manner he contends. Accordingly, we overrule appellant's first issue as it pertains to C.S.

## II. Error in the Jury Charge on Punishment

In his second issue, appellant contends that the trial court committed error during the punishment phase of the trial when it failed to, *sua sponte*, give the jury a reasonable doubt instruction on extraneous offenses. As we explain below, we agree; however, we do not find that the error was harmful.

### A. The Trial Court Erred

■ At the punishment phase of trial, the State may introduce evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt to have been committed by the defendant. TEX. CODE CRIM. PROC. art. 37.07, § 3(a)(1); *Huizar v. State*, 12 S.W.3d 479, 480–81 (Tex.Crim.App.2000). Article 37.07 is the law applicable to the case. *See Delgado v. State*, 235 S.W.3d 244, 252 (Tex.Crim.App.

2007); *Zarco v. State*, 210 S.W.3d 816, 821 (Tex.App.-Houston [14th Dist.] 2006, no pet.).

■ An extraneous offense is "any act of misconduct, whether resulting in prosecution or not, that is not shown in the charging papers." *Rankin v. State*, 953 S.W.2d 740, 741 (Tex.Crim.App.1996). At punishment, a defendant is entitled to have the jury receive a reasonable doubt instruction regarding extraneous offenses without request. *Huizar*, 12 S.W.3d at 484. Therefore, it is error if the trial court fails to instruct the jury *sua sponte*. *Zarco*, 210 S.W.3d at 821 (citing *Huizar*, 12 S.W.3d at 484). Although a defendant need not object at trial to preserve error, *Huizar*, 12 S.W.3d at 484, the failure to object increases appellant's burden on appeal. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App.1984). In this situation, appellant will obtain a reversal only if he can demonstrate egregious harm. *Id.* Stated differently, when the trial court commits error, and the defendant fails to object to that error, a reviewing court will reverse "only if the error is so egregious and created such harm that [the appellant] has not had a fair and impartial trial." *Id.* (internal quotations omitted).

Here, at punishment, the State reoffered all the evidence from the guilt/innocence phase of trial, which consisted of the complainants' testimony regarding both the indicted offenses and extraneous offenses. With respect to J.A., the State contends that her testimony does not amount to evidence of extraneous offenses, as that testimony merely quantified the number of times appellant committed the acts alleged in the indictment. With respect to C.S., the State does not attempt to refute appellant's argument that the trial court erred in omitting a reasonable doubt instruction in the jury charge on punishment; rather, it contends that the omission did not work

egregious harm, and therefore does not require reversal. Appellant argues that the complainants testified about extraneous acts that were not alleged in the indictments, and the trial court was therefore required to instruct the jury that they could not consider those acts in assessing punishment unless they were convinced beyond a reasonable doubt the acts were committed by the defendant or attributable to him. We agree with appellant that the indicted offenses and the extraneous offenses were separate occurrences.

### 1. *Worley* and *Martinez* are Distinguishable

Initially, the State claims that J.A.'s testimony does not amount to evidence of extraneous offenses, as it merely quantified the number of times appellant committed the acts alleged in the indictment. It relies on *Worley v. State*, 870 S.W.2d 620 (Tex.App.-Houston [1st Dist.] 1994, pet. ref'd), and *Martinez v. State*, 190 S.W.3d 254 (Tex.App.-Houston [1st Dist.] 2006, pet. ref'd.), in support of its argument.[2] Those cases are distinguishable.

In *Worley,* the appellant was convicted of three counts of aggravated sexual assault of a child and two counts of indecency with a child by contact. *Id.* at 621. The five counts involved four children; two of these counts involved the same complainant. *Id.* At trial, this complainant testified that the appellant had touched him, "in any sort of sexual way," "at least over a hundred times." *Id.* This complainant further testified that the appellant had put his mouth on the complainant's penis "two or three times." *Id.* On appeal, the appellant contended that the complainant's testimony constituted evidence of extrane-

ous offenses, and should not have been admitted into evidence without notice to the accused, as required by Rule 404(b) of the Texas Rules of Criminal Evidence. *Id.*

In overruling the appellant's point of error, the First Court of Appeals noted that the complainant's answer, "over a hundred times," did not describe an offense, but merely quantified its occurrence. *Id.* at 622. The court noted that the complainant's testimony was in response to questions about either fondling or oral-genital contact, both of which were alleged to have been committed against him in the indictment. *Id.* The court ultimately found that the complainant "never testified to any offenses outside the indictment," and held that the complainant's testimony did not amount to evidence of extraneous offenses. *Id.* at 622–23. The First Court reached the same result, on slightly different facts, in *Martinez.* 190 S.W.3d at 262–63.

Contrary to the State's assertion, the present case is controlled by *Vernon v. State,* 841 S.W.2d 407 (Tex.Crim.App. 1992). In that case, the appellant was convicted of aggravated sexual assault for digital penetration of the complainant's vagina. *Id.* at 408. At trial, the complainant testified that the appellant had committed several similar, but unalleged, acts of sexual abuse over a number of years, beginning nearly seven years before the offense on which the appellant had been indicted. *Id.* at 410. The court of appeals held that admission of the evidence was in the trial court's discretion, on the ground that the appellant was engaged in "some sort of continuing criminal enterprise," so that the extraneous offenses were properly regarded as "individual manifestations of the

---

**2.** The State apparently concedes that C.S. testified to extraneous offenses at trial, and the trial court erred in not providing a reasonable doubt instruction in the jury charge at punish-

ment. However, the State contends that this error did not work egregious harm on appellant. As we explain below, we agree.

growing abuse" of the complainant. *Id.* The court of appeals further held that the unalleged acts of sexual abuse were not to be considered extraneous offenses, because "they were part of the ongoing crime itself," "or because, in any case, they were *res gestae* of the crime, tending to illuminate the unnatural relationship" between the complainant and the appellant. *Id.* (internal quotations omitted).

In reversing the court of appeals, the Texas Court of Criminal Appeals held that the acts of sexual misconduct—both the indicted offense and the unalleged offenses—did not comprise a single offense under Texas law. *Id.* Instead, the Court concluded that the unalleged offenses were extraneous offenses for purposes of the Texas Rules of Criminal Evidence, and noted that "those who commit multiple discrete assaults against the same victim, are liable for separate prosecution and punishment for every instance of such criminal misconduct." *Id.* (citations omitted). The Court further held that, pursuant to Rule 404(b), evidence of extraneous offenses is admissible only when relevant to prove an elemental fact or an evidentiary fact of consequence to determination of the action. *Id.* at 411. The Court reversed and remanded for an evaluation of harm under the then-applicable Texas Rule of Appellate Procedure 81(b)(2). *Id.*

## 2. C.S. and J.A. Testified About Acts Not Alleged in the Indictments

█ Here, appellant was indicted on the offenses of (1) indecency with a child by contact and (2) aggravated sexual assault of a child under fourteen years of age. The charges were alleged in separate indictments: with respect to J.A., appellant was charged only with the offense of indecency with a child, "by touching the genitals of [J.A.] with the intent to arouse and gratify the sexual desire of [appel-

lant]"; with respect to C.S., appellant was only charged with the offense of aggravated sexual assault, "by placing his finger in the female sexual organ of [C.S.]." However, at trial, both J.A. and C.S. testified about acts of sexual abuse not alleged in the indictment, namely that appellant had fondled their breasts on more than one occasion. Fondling falls within the category of indecency with a child under Penal Code section 21.11(c). *See* TEX. PEN. CODE ANN. § 21.11(c). Separate instances of fondling are different offenses under the Penal Code, not merely multiple occasions of the same offense. *Graves v. State*, 176 S.W.3d 422, 434 (Tex.App.-Houston [1st Dist.] 2004, pet. struck). Penetration is an aggravated sexual assault under Penal Code section 22.021. TEX. PEN. CODE § 22.021.

Because the complainants testified about acts that were not alleged in the indictments, their testimony regarding these acts amounts to evidence of extraneous offenses. *Vernon,* 841 S.W.2d at 410–11. Therefore, the trial court was required to give a reasonable doubt instruction at punishment. *Huizar,* 12 S.W.3d at 484; *Zarco,* 210 S.W.3d at 821. Its failure to instruct the jury accordingly was error. *Huizar,* 12 S.W.3d at 484. We now turn to the harm analysis.

## B. The Error Was Not Harmful

### 1. Egregious Harm Standard

█ Deciding whether error occurred is only part of our inquiry; once error is found, we must determine whether the error harmed appellant. *Zarco,* 210 S.W.3d at 823. We will reverse only if the error amounted to egregious harm. *Id.* (citing *Almanza,* 686 S.W.2d at 171; *Saunders v. State,* 817 S.W.2d 688, 692 (Tex. Crim.App.1991)). We must determine the impact of the error on a case-by-case basis.

*Id.* (citing *Hutch v. State,* 922 S.W.2d 166, 171 (Tex.Crim.App.1996)).

■■■■ Egregious harm exists when the defendant's rights are injured to the point that he was denied a fair and impartial trial, when the error (1) went to the very basis of the case; (2) denied the defendant a valuable right; or (3) vitally affected his defensive theory. *Almanza,* 686 S.W.2d at 172. This degree of harm "must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Id.* at 171. Egregious harm is the highest standard of harm an appellant must meet to obtain a reversal, in part because it involves error raised for the first time on appeal. *Zarco,* 210 S.W.3d at 824 (citing *Almanza,* 686 S.W.2d at 172–74).

### 2. Application of the Egregious Harm Standard

■■■ In making our determination of whether egregious harm exists, we will review generally the following at both phases of trial: (1) the state of the evidence; (2) closing argument and the degree to which the error may have been emphasized at the punishment phase; (3) the jury charges; and (4) the punishment ultimately assessed. *Id.* at 824 (citing *Davis v. State,* 28 Tex.App. 542, 13 S.W. 994, 995 (1890); *Almanza,* 686 S.W.2d at 173–74; *Hutch,* 922 S.W.2d at 171). We turn now to that analysis.

### a. Examination of the Record

#### i. The Trial Testimony at Guilt/Innocence Supported the Complainants' Claims

■■■ The State presented five witnesses, including C.S. and J.A., who had some knowledge of the sexual abuse and the circumstances regarding the complainants' disclosure to authorities.

### 1. The Complainants' Testimony About the Sexual Abuse Was Equally Clear, Equally Direct, Equally Consistent, and Equally Specific in Detail

At the time of trial, C.S. was sixteen years of age and in the eleventh grade, and J.A. was fourteen years of age and in the ninth grade. Each testified about the charged offenses, as well as the extraneous offenses. Their testimony in support of the charged offenses and extraneous offenses was equally clear, equally direct, equally consistent, and equally specific in detail.

### A. C.S.'s Testimony

C.S. testified at trial that her relationship with appellant was very close until approximately 2002, when she turned twelve years of age. It was around this time that appellant became more strict and controlling, and his relationship with C.S. consequently changed. C.S. further testified that her relationship with appellant became "more intimate" when she was nine or ten years of age; specifically, it was around this time that appellant began kissing and touching C.S. differently than he had previously. C.S. explained that appellant often kissed her using his tongue, and, on one occasion, commented, "Your mom would kill me if she knew we were kissing like this." C.S. further explained that, on more than one occasion, appellant touched her breasts over her clothing while the two were alone in her bedroom. However, C.S. could not quantify the number of times that appellant had touched her in this manner.

With respect to the charged offense, C.S. further related that, in June 2001,

when C.S. was eleven years of age, appellant touched her "in her vagina" while the entire family was watching movies in the living room late at night. On this occasion, C.S. and appellant were lying next to one another on the sofa, covered by blankets, while Arcos, J.A., and her older sisters sat on the floor and another sofa, respectively. C.S. testified that appellant reached beneath her underwear, penetrated her vagina with his finger, and continued to move his hand until C.S. shifted her weight less than five minutes later, whereupon appellant removed his finger and ceased such contact. According to the testimony, appellant never again touched C.S. in this manner nor kissed C.S. in the manner described above following this occasion. In fact, C.S. testified that after she had begun having her period, appellant commented that C.S. was "acting funny with him," and "didn't let him touch [her] or anything." C.S. did not inform anyone of this incident, or of any of appellant's prior "intimate" conduct, until October 2005.

## B. J.A.'s Testimony

J.A. testified at trial that her relationship with appellant was "pretty normal" until 1999, when she turned seven years of age. It was around this time that appellant became more strict, getting mad at his stepdaughters, in J.A.'s words, "over anything we did." J.A. further testified that it was also around this time that appellant began touching her inappropriately. J.A. explained that, early in the morning, after Arcos left for work and while J.A. was sleeping, appellant would come over to J.A.'s bed, take her covers off, and touch her breasts and vagina, at first over her clothes, and then underneath. J.A. further explained that appellant's behavior had progressed over time: at first, appellant would only touch her breasts and vagina over her clothes, but, by the time J.A. was seven-and-one-half years of age, appellant

had started touching both her breasts and her vagina underneath her clothes.

J.A. further related that appellant never penetrated her vagina, that he would follow the above-described procedure during each touching episode, that each episode would last for three to five minutes, that she would wake up during these episodes, and that appellant continued to touch her in this manner twice a week for a period of approximately one year, eventually stopping sometime in 2000. J.A. testified that she informed C.S. of appellant's behavior shortly after it began, but before appellant had begun touching her underneath her clothes. J.A. explained that she never again told C.S. of the sexual abuse, even after appellant had begun touching her underneath her clothes, out of fear that C.S. would inform Arcos, and that J.A. would get into trouble for the inappropriate touching. Other than C.S., J.A. did not inform anyone of appellant's inappropriate touching until October 2005.

In sum, the complainants' testimony in support of the charged offenses and extraneous offenses was equally clear, equally direct, equally consistent, and equally specific in detail. C.S. provided a graphic account of her "intimate" relationship with appellant prior to the charged offense, the details of which form the substance of appellant's complaint regarding extraneous offenses. C.S. further provided an equally-detailed account of the circumstances surrounding and the manner in which appellant had penetrated her vagina. Similarly, J.A. related the graphic details of the touching episodes she suffered at the hands of appellant—by her estimate, two touching episodes per week for a period of approximately one year. Her testimony in support of the charged offense and extraneous offenses was identical: the extraneous offenses were merely separate occurrences of the charged offense; the State

merely indicted appellant on a portion of the conduct occurring in each touching episode.

Although the present appeal does not involve the failure of the trial judge to honor a defendant's election request, we find the following language from the Court of Criminal Appeals persuasive:

> [W]e see no risk that the jury found appellant guilty of an offense that was not proven to its satisfaction beyond a reasonable doubt. The "multiple offenses" were all recounted by the same source—the child. This case is not concerned with evidence of different activities from different sources that a jury might perceive to "add up" to the defendant being guilty even though no individual offense was proven beyond a reasonable doubt. Moreover, the child complainant did not testify about a number of varied incidents with differing details that might have incrementally added to the idea that the defendant must have done something to provoke the plethora of stories about his activities. Rather, the child articulated one sequence of events and merely answered that this sequence happened one hundred times, with all but one of those instances occurring at night. The child was either credible in giving this unified account or she was not. Whether the sequence of events was alleged to have occurred one, ten, fifty, or one hundred times does not by itself impact the believability of the child's story.

*Dixon v. State*, 201 S.W.3d 731, 735 (Tex. Crim.App.2006).

## 2. The Adult Testimony in Support of C.S. and J.A. Corroborated the Complainants' Claims, and Was Consistent with the State's Theory of the Case

To complete the story of how the sexual abuse came to the attention of the complainants' family and eventually the authorities, the State presented the testimony of: (1) Margarita Arcos, the complainants' mother; (2) Ivee Syon, a forensic interviewer at the Children's Assessment Center to whom C.S. and J.A. initially disclosed the details of appellant's sexual abuse; and (3) Kim Barnes, the police officer who initially contacted appellant regarding the allegations made against him.

These witnesses each presented clear, direct, and consistent testimony regarding the complainants' allegations against appellant. Their testimony corroborated that of the complainants in all material respects, and was consistent with the State's overall theory of the case—that appellant was a sexual predator whose abuse of the complainants increased over time, and that his deportation-in-the-event-of-divorce defense was fabricated after-the-fact.

Arcos's testimony relating to her relationship with appellant presented a picture of appellant that was consistent with the complainants' allegations of sexual abuse. She testified that during their marriage, she and appellant were both socially and sexually isolated from one another, and that this isolation increased over time. Specifically, she testified that appellant "didn't really like to be involved sexually," and that the two of them only had sex three times per year—on her birthday, on Christmas, and on Mother's Day.

Syon's testimony was further consistent with the allegations of sexual abuse made by the complainants. She testified that while there is no "typical response" from a child victim of sexual abuse, both C.S. and J.A. exhibited behaviors indicative of embarrassment and shame, both of which are "a very strong dynamic in sexual abuse." She explained that during their respective

interviews, the complainants were quiet, uncomfortable talking about the subject of sexual abuse, shameful, and "had very soft voices." Syon further explained that the complainants exhibited a change in demeanor when the subject of sexual abuse was broached. Specifically, Syon testified that C.S. actually spoke of the guilt and shame in her involvement in appellant's sexual abuse, because "it felt good," and "before then, she didn't know it was wrong." Syon further testified that J.A. was uncomfortable with the interview, was quick and to the point, and did not provide much details; in fact, Syon testified that, during the interview, she had to ask direct questions of J.A., as she was "not very free in her narrative."

Barnes's testimony concluded the presentation of the State's case, and provided some final details as to appellant's pre-indictment behavior. Barnes testified that she contacted appellant on October 26, 2005, and informed him of the sexual abuse allegations made against him. She noted that, upon notifying him of the allegations, appellant related to her that, when C.S. was seven years old, she told appellant that "if he ever left she would call the police and tell them [appellant] touched her middle part." Barnes further testified that, while such behavior was not *per se* unusual, appellant failed to return her telephone call or otherwise schedule an interview with her related to the allegations.

### 3. Appellant Failed to Impeach the Credibility of any Prosecution Witness, or Otherwise Substantiate his Deportation–in–the–Event–of–Divorce Defense Theory

Appellant was the sole defense witness called to testify at trial. His testimony relating to the sexual abuse allegations consisted of terse denials of each charge. Appellant's attempt to explain his relationship with Arcos and his regular absences from the family apartment was equally devoid of detail. Defense counsel focused the majority of his efforts, during both direct examination and cross-examination, on attempting to impeach the credibility of the State's witnesses, specifically with regards to Arcos's citizenship status and discipline problems with the complainants, particularly C.S. However, on direct examination, appellant failed to substantiate or otherwise explain the crux of his defense theory—that he sought a divorce from Arcos in October 2005, and the sexual abuse allegations were made shortly thereafter. Furthermore, on cross-examination of the complainants, defense counsel failed in his attempt to impeach their credibility; in fact, the practical effect of defense counsel's efforts was to buttress the testimony of the complainants and Arcos.

### ii. Closing Argument at the Guilt/Innocence Phase Was Uneventful, and the Jury Charge Properly Limited the Jury's Consideration of the Extraneous Offenses

In its closing argument at guilt/innocence, the State did not urge a finding of guilt based upon an exaggerated version of the testimony presented at trial. The record reflects that the State based its entire closing argument on facts presented in evidence, and logically connected the testimony of each witness, particularly that of the complainants and of appellant himself, to the State's theory of the case. The jury charge properly instructed the jurors not to consider evidence of the extraneous offenses unless they were convinced beyond a reasonable doubt that appellant committed them:

> You are further instructed that if there is any evidence before you in this case regarding the defendant's committing other crimes, wrongs, or acts against the child who is the victim of the alleged

offense in the indictment in this case, you cannot consider such evidence for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other crimes, wrongs, or acts against the child, if any, and even then you may only consider the same in determining its bearing on relevant matters, including: (1) the state of mind of the defendant and the child; and (2) the previous and subsequent relationship between the defendant and the child, and for no other purpose.

### iii. At the Punishment Phase, Both Sides Presented Testimony; the Defense Presented Testimony Designed to Encourage the Jury to Consider Probation

At the punishment phase, both sides presented testimony. The State called C.S. to testify regarding the effects of the sexual abuse on her life, particularly her interpersonal relationships with friends and her performance in school. The defense called two witnesses: appellant and Terrell J. Owens, pastor of True Love Ministries, the church in which appellant is a member and a minister. Appellant testified primarily regarding his service in the United States Army and his responsibilities in the church; Owens testified further regarding the latter. On cross-examination, Owens stated that appellant is "a good spirit" and "a good man," and that, if appellant was granted probation, Owens would help him successfully complete his term, and retain him as a minister in the church.

### iv. The Closing Arguments at Punishment Were Uneventful

At the punishment phase, the closing arguments were equally uneventful. The defense focused its attention on probation as the appropriate form of punishment, and guaranteed the jurors that, if probation were granted, the trial judge would punish appellant severely for violating any condition imposed. In contrast, the State premised its argument on the effects of the sexual abuse on the complainants' lives, and further argued that the present case was not an appropriate one for probation, because (1) appellant denied all responsibility for the charges, thereby refusing to admit he is a sex offender; (2) the sexual abuse consisted of repeated acts that appellant enjoyed, in contrast to a single offense for which he admits guilt, is remorseful, and seeks help; and (3) appellant deserves more than ten years' imprisonment for the repeated acts of abuse. In so doing, the State based a significant part of its closing argument on these repeated acts of abuse, even approximating that, with respect to J.A., appellant committed, by a conservative estimate, one hundred and four acts of sexual abuse over a one-year period.

### v. The Jury Charge at Punishment Failed to Contain a Reasonable Doubt Instruction

At the punishment phase, the jury charge failed to contain a reasonable doubt instruction with respect to the jury's consideration of extraneous offenses. Consequently, the jury was not instructed that it could not consider evidence of extraneous offenses unless it found beyond a reasonable doubt that appellant committed them. Moreover, appellant failed to object to the trial court's failure to include an appropriate instruction in the jury charge.

### b. Harm Analysis

After having reviewed the trial proceedings, we now consider whether appellant suffered egregious harm. *See Zarco*, 210 S.W.3d at 826–27. Based on our review,

we conclude that appellant was not egregiously harmed by the trial court's failure to include a reasonable doubt instruction in the jury charge on punishment. Even without this instruction, appellant received a fair and impartial trial. More importantly, as we explain below, even if the jury had only considered evidence of the charged offenses at the punishment phase, the punishment actually assessed was reasonable and fair, given the severity of the charged offenses and the age of the complainants.

First, the testimony relating to the extraneous offenses was introduced at the guilt/innocence phase of trial, where the jury was properly charged. Consequently, if the jury considered these offenses at guilt/innocence, it did so only after finding beyond a reasonable doubt that appellant committed them. *Id.* at 826. At the punishment phase, the State presented only the testimony of C.S., which related solely to the *effects* of appellant's sexual abuse on her life.[3] At the conclusion of C.S.'s testimony, the State merely reoffered all the evidence from the guilt/innocence phase of trial, and rested. Notably, the State did not introduce additional extraneous offense evidence at punishment; instead, during closing, the State briefly summarized and discussed the extraneous offense evidence already introduced at guilt/innocence, and urged the jury to assess the punishment it deemed appropriate. The fact that the State discussed this extraneous offense evidence during its closing argument does not preclude a finding that appellant was not egregiously harmed by the trial court's failure to properly instruct the jury at punishment. *See id.* (finding no egregious harm, despite the fact that the State referred to extraneous offense evidence during its closing argument); *see also Graves v. State*, 176 S.W.3d 422, 434–36 (Tex.App.-Houston [1st Dist.] 2004, pet. struck) (finding no egregious harm, even though the State referred to extraneous offense evidence at cross-examination during punishment, and discussed that evidence during its closing argument). Rather, the jury could properly consider this extraneous offense evidence—introduced at guilt/innocence—in its assessment of punishment. *See Duffy v. State*, 567 S.W.2d 197, 208 (Tex.Crim.App.1978) ("[I]n assessing punishment the jury may consider all the evidence adduced at trial on guilt or innocence."); *see also Burks v. State*, 227 S.W.3d 138, 152 (Tex.App.-Houston [1st Dist.] 2006, pet. ref'd) ("[T]he jury properly considers guilt-innocence evidence during punishment . . . .").

Second, with respect to the extraneous offense evidence introduced at guilt/innocence, the character of the complainants' testimony regarding the extraneous offenses was identical to the testimony regarding the charged offenses. *Zarco*, 210 S.W.3d at 826 (citing *Davis*, 13 S.W. at 995 (instructing the appellate court to consider the character of the testimony to which the omitted charge language applied)). The complainants' testimony, both that in support of the charged offenses and that in support of the extraneous offenses, was reasonable and of such a character that a reasonable mind could entertain it beyond a reasonable doubt, particularly when considered in conjunction with the testimony presented by Arcos and Syon. *Id.* (citing *Davis*, 13 S.W. at 995 (further instructing the appellate

3. Specifically, C.S. testified that, as a result of the sexual abuse, she was depressed; her depression was fueled by the sense of guilt she felt "for what happened between [herself] and appellant"; she had once contemplated suicide; she continued to have difficulty trusting others, particularly men; and she sought professional help from a therapist, whom she regularly saw for a nine-month period beginning in October 2005.

court to determine whether the character of the testimony was reasonable and presented a theory which a reasonable mind could entertain when considered in conjunction with the other testimony in the case)). C.S.'s testimony regarding the extraneous offenses was provided with the same level of detail as that in support of the charged offense. Similarly, J.A.'s testimony regarding the charged offense and the extraneous offenses was identical, as both occurred during the same touching episodes, which were repeated over the course of one year, and was further consistent with Arcos's testimony. Furthermore, Syon testified that both complainants exhibited behaviors indicative of embarrassment and shame during their respective interviews, which is consistent with other child victims of sexual abuse, and further testified that both complainants experienced a change in demeanor when the subject of sexual abuse was broached, and not merely when the particular charged offenses were discussed. In sum, the complainants' testimony in support of the extraneous offenses was of the same character and strength as their testimony in support of the charged offenses, and was of such character that a reasonable mind could entertain it when considered in conjunction with the other testimony in the case, including that of appellant himself.

Third, the punishment the jury assessed was at the low end of the punishment range. On the indecency charge, the jury could have assessed punishment at as little as two years or as much as twenty years; on the sexual assault charge, the jury could have assessed punishment at as little as five years or as much as life imprisonment. Instead, the jury assessed punishment at four years' imprisonment on the indecency charge and ten years' imprisonment on the sexual assault charge, with no fine, despite the fact that the State sought a sentence in the range of ten to twenty years on each charge. This factor further supports a finding that appellant was not egregiously harmed by the trial court's charge error at punishment. *See Graves*, 176 S.W.3d at 435–36 (finding no egregious harm, in part because the sentence assessed by the jury was far below the maximum available sentence, and the State had sought a greater sentence); *see also Jones v. State*, 111 S.W.3d 600, 609–10 (Tex.App.-Dallas 2003, pet. ref'd) (finding no egregious harm, in part because the jury assessed punishment far below the maximum available punishment, despite the State's plea for the maximum); *Tabor v. State*, 88 S.W.3d 783, 788–89 (Tex.App.-Tyler 2002, no pet.) (finding no egregious harm, in part because the sentence imposed was "well within" the punishment range, and the State sought a greater sentence). More importantly, even if the jury had only considered evidence of the charged offenses at the punishment phase, it cannot be said that a four-year and ten-year sentence was not reasonable and not fair, given the severity of the charged offenses and the age of the complainants. *See Zarco*, 210 S.W.3d at 827.

For the foregoing reasons, we conclude that appellant received a fair trial and that he did not suffer egregious harm by the trial court's error in omitting a reasonable doubt instruction from the jury charge at punishment. We therefore overrule his second issue.

## Conclusion

We therefore affirm the trial court's judgment.