

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-13-00123-CR

RICHARD ANDREWS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 102nd District Court
Bowie County, Texas
Trial Court No. 12F0189-102

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

O P I N I O N

Richard Andrews was indicted in Bowie County, Texas, for aggravated assault with a deadly weapon resulting in bodily injury. Specifically, the indictment, as written, alleged that Andrews had caused bodily injury to "William ***Boc*** by shooting William ***Box*** with a firearm." (Emphasis added.). After a jury trial, Andrews was found guilty of the offense charged in the indictment, being sentenced to twenty years' confinement and fined $10,000.00.

On appeal, Andrews contends that the trial court erred: (1) by refusing to allow cross-examination of the victim concerning a civil suit the victim had filed against Andrews for injuries sustained in the alleged shooting, (2) by refusing to allow cross-examination of the victim regarding the victim's parole status at the time of the shooting, (3) by admitting, during the punishment phase, evidence of extraneous bad acts committed by the accused, (4) in finding him guilty notwithstanding his allegation of the existence of a fatal variance between the victim's name and the injured person named in the indictment, (5) by refusing to submit a jury charge on idem sonans, and (6) by refusing to allow Andrews to introduce a Federal Bureau of Investigation (FBI) bulletin as evidence.

I.      **Factual Background**

At the time of the incident giving rise to the indictment, Vallory Lewis (who was then Andrews' fiancé and who became his wife before trial), apparently engaged in some kind of altercation with Andrews. She left Andrews' house—where she had been staying—and went to the house of a friend of hers, Steve Barber. When she arrived at Barber's house, she discovered that Barber, William (usually known as "Billy") Box, and Darien Hatcher were there. She told

the group that Andrews had been beating her and requested that the group accompany her back to Andrews' house[1] in case Andrews returned with violence in his heart. Although Hatcher left the group, Barber and Box went with Lewis back to the residence where Lewis and Andrews resided. When they arrived, Andrews was not present, and the three of them drank alcohol and smoked marihuana. Although there was evidence that Barber and Box engaged in sexual conduct with Lewis as well, Lewis denied this.

Barber had a lengthy and sometimes stormy friendship with Andrews,[2] but Box testified that he had only known Lewis and Andrews for a few months.

Andrews returned home the next day and discovered Box and Barber, outside the house with Lewis. Upon Andrews' return, Lewis went inside the house, leaving Box and Barber on the carport where Box had started his motorcycle in preparation to leave. There was disputed testimony that Andrews had been drinking and taking pills and that he looked like he was under the influence of something when he returned home. Barber and Box had a brief conversation with Andrews wherein they told Andrews that if he engaged in physical treatment of Lewis in the future, he would be forced to answer to them.

During this period of the conversation, Box had started his motorcycle and was warming the engine; Andrews, believing the engine to be excessively loud, turned it off. Box started the engine once more, prompting Andrews to again switch it off. This exchange precipitated an

---

[1]Andrews owned the home, and Lewis had lived there with Andrews for about a year prior to this incident.

[2]Prior to dating Andrews, Lewis had been romantically involved with Barber, and Andrews testified that he had told Lewis that he did not want Barber around his house.

argument and a struggle between the two men, during which Box either pushed or threw Andrews to the ground.

The stories diverge somewhat at this point. Andrews maintains that immediately after rising from the ground, he entered the house. Box and Barber testified that before Andrews went into the house, Box and Andrews reconciled, apologized to each other, and reaffirmed that "everything was good" between them. Box testified that he hugged Andrews, told him they were still friends, and urged Andrews to forget that the incident had occurred. Andrews went inside the house.

Box and Barber testified that they stayed outside for several minutes to allow the motorcycle's engine to warm up so they could use it to leave. Their testimony was consistent with each other in saying that then they returned inside the house for the purpose of telling Lewis and Andrews goodbye, Box entering the house first, followed a few steps behind by Barber. They testified that as soon as Box entered the kitchen door, Andrews shot him.

It is undisputed that in the kitchen area of the house, Andrews shot Box several times with a revolver. Box suffered paralysis and was rendered a paraplegic as a result of the shooting. According to Lewis, Andrews always carried a gun with him.

Both Box and Barber testified that after the first shot, Box fell to the floor. At the outset of the gunfire, Barber saw Lewis walk outside the house. Barber watched as Andrews walked to Box's prone form and shot him three more times. Barber remembered yelling at Andrews and Box asking Barber to pull him out of there. Barber saw Andrews unload the gun and set it down before Andrews called 9-1-1.

4

Andrews' and Lewis' versions of the events in the moments just preceding the first shot differed substantially from the story told by Box and Barber. Andrews testified that when he entered the house after encountering Box on his motorcycle, Barber and Box followed him immediately,[3] threatening to beat him. Lewis concurred with Andrews' testimony that the two men threatened Andrews, surrounding Andrews and Lewis as they sat on the couch.[4] Both Andrews and Lewis testified that Box was running through the house making threats and that even though Andrews and Lewis repeatedly told the men to leave, Box and Barber refused to do so. Box and Barber maintained that neither Andrews nor Lewis told either of them to leave, and they further denied that either of them had made threats toward Andrews or Lewis at any time. Lewis testified that she walked Barber and Box out of the house and shut the door, but that Box barged back inside and threatened to kill both Andrews and Lewis.

According to the version of the incident as told by Andrews, after Box had threatened him and Lewis and refused to leave the premises, when Andrews returned to the kitchen to call the police, Box rushed at him. Andrews drew his pistol and warned Box but when Box ignored his warning, Andrews shot him. Although Lewis did not see the shooting itself, she did see Box fall to the floor. Andrews called 9-1-1 and then unloaded the gun and set it on the counter as per the instructions of the 9-1-1 dispatcher. A recording of Andrews' 9-1-1 call was played for the jury.

---

[3]Lewis testified that when Andrews arrived, he went into the house, and that Box and Barber followed him into the house. She never saw the men together outside the house.

[4]In her statement to the police, Lewis denied that either Box or Barber threatened them. This contradicted her testimony at trial.

5

From outside the house, Lewis also dialed 911 for assistance. It appears from the recording of that call (which was heard by the jury) that it was placed before Andrews' call. During her call, Lewis said that she did not know what Andrews was going to do, that he had "major anger issues," and that she had heard three gun shots. The responding police officers testified that Lewis appeared nervous and afraid.

Andrews was indicted for aggravated assault with a deadly weapon resulting in bodily injury. Specifically, he was accused of shooting Box.[5] After a jury trial, he was found guilty, sentenced to twenty years' confinement, and fined $10,000.00.

### A. Did the Trial Court Err by Refusing to Allow Andrews to Cross-Examine the Victim Concerning a Civil Suit Against Andrews?

A few days prior to trial, the State filed a motion in limine seeking an order that Andrews was to "refrain from mentioning or referring to . . . [a]ny mention that a civil suit has, could, or will be filed involving this cause of action . . . ." The trial court granted the State's motion in its entirety. During cross-examination of Box, Andrews approached the bench and notified the court that he desired to cross-examine the complainant regarding the civil suit Box had filed against Andrews, but the trial court denied Andrews' request. Outside the presence of the jury, Andrews made an offer of proof establishing, in part, that on April 24, 2012, Box filed a suit for money damages against him based on the events of this case.

In his first point of error, Andrews contends that the trial court erred by preventing him from cross-examining Box about the civil suit.

---

[5]As mentioned elsewhere, the indictment alleged that Andrews had injured "William Boc by shooting William Box with a firearm."

6

Trial courts have discretion in admitting or excluding evidence during a trial. On appeal, we review a trial court's decision to limit cross-examination for an abuse of discretion. *See Sansom v. State*, 292 S.W.3d 112, 118 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd). The scope of cross-examination in Texas is broad and extends to facts that may affect the witness' credibility. *See Carroll v. State*, 916 S.W.2d 494, 497 (Tex. Crim. App. 1996); *see also* TEX. R. EVID. 611(b). A defendant is entitled to pursue all avenues of cross-examination reasonably calculated to expose a motive, bias, or interest for the witness to testify. *Carroll*, 916 S.W.2d at 497. However, the scope of appropriate cross-examination is not unlimited, and the trial court generally has "wide discretion in limiting the scope and extent of cross-examination." *Hammer v. State*, 296 S.W.3d 555, 561 (Tex. Crim. App. 2009); *Carroll*, 916 S.W.2d at 498. For example, a trial court may properly limit the scope of cross-examination to prevent harassment, prejudice, confusion of the issues, harm to the witness, and repetitive or marginally relevant interrogation. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *Carroll*, 916 S.W.2d at 498.

Whether a witness brought a civil suit against a defendant arising from the same incident for which the defendant is on trial is generally admissible as tending to show interest and bias on the part of the witness. *See Cox v. State*, 523 S.W.2d 695, 700 (Tex. Crim. App. 1975). Under certain circumstances, evidence of the complainant's civil suit against a third party may also be relevant to show bias. *Compare Hoyos v. State*, 982 S.W.2d 419, 421–22 (Tex. Crim. App. 1998) (holding no error in excluding evidence of complainant's civil suit); *Shelby v. State*, 819 S.W.2d 544, 545 (Tex. Crim. App. 1991) (holding trial court erred by refusing to allow cross-examination regarding civil suit); *Furgison v. State*, 800 S.W.2d 587, 589–91 (Tex. App.—

7

Houston [14th Dist.] 1990, pet. ref'd) (holding same). Relevance of such evidence is derived from its impeachment value to show motive to give false testimony based on a witness's desire to recover damages or other relief. *See Palermo v. State*, 992 S.W.2d 691, 698 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd).

During Andrews' offer of proof, the following exchange occurred between Andrews and Box:

> Q.      Now, back April 24th, 2012, you filed a civil lawsuit against Mr. Andrews?
>
> A.      Yes, sir.  I believe I did.
>
> Q.      And you're seeking to recover money damages from Mr. Andrews?
>
> A.      I don't know what I'm going to -- I don't know what you mean.  No, I'm not.
>
> Q.      Well, you're suing him?
>
> A.      I want these medical bills paid.
>
> Q.      Okay.  You're suing him, and you're asking that he pay money, correct?
>
> A.      Yes, sir.  That's correct.
>
> Q.      So you have an interest in seeing that Mr. Andrews is convicted, don't you?
>
> A.      Yes, sir, because he shot me down like a dog.  Yes, I do have -- I do.  You damn right I have an interest in it.
>
> Q.      And in your lawsuit, you state that Mr. Andrews is legally responsible for damages as he was negligent in his actions on that day?
>
> A.      Yes, sir.  Yes, sir.  If that's what it says, that's what it says, yes, sir.

The issue here was that Box filed a civil lawsuit against Andrews regarding the same incident giving rise to the criminal charges. Thus, it could be said that Box had an economic motive to shade his testimony during the criminal trial against Andrews; because of this motive, Andrews should have been able to cross-examine Box on the general nature of the civil lawsuit. *See Cox*, 523 S.W.2d at 700. Such cross-examination would not have confused the issues or harmed or harassed Box, was not repetitive, and was more than marginally relevant to show bias. Therefore, the trial court erred in failing to allow Andrews to cross-examine Box regarding the civil suit against Andrews.

Having concluded that the trial court erred in this ruling, we must reverse the judgment unless we can determine beyond a reasonable doubt that the error did not contribute to the conviction. *See* TEX. R. APP. P. 44.2(a). When making such a determination, we must first assume that the damaging potential of the cross-examination was fully realized. *See Van Arsdall*, 475 U.S. at 684. With that assumption in mind, we review the entire record and consider the following factors: (1) the importance of the witness's testimony in the prosecution's case, (2) whether the testimony was cumulative, (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, (4) the extent of cross-examination otherwise permitted, and (5) the overall strength of the prosecution's case. *Id*. Finally, we then determine whether the error was harmless beyond a reasonable doubt. *Id*.

Here, it is undisputed that Andrews shot Box several times. The issue was whether Andrews had acted in self-defense. While there was no evidence that Box was armed, Lewis and Andrews testified that both Barber and Box were threatening Andrews and that Box

9

unexpectedly reentered the house immediately before being shot. Andrews testified that Box rushed at him and that he shot Box in self-defense in response to that perceived threat. Box denied making any threats or rushing Andrews. Box's testimony was important to the State's case, but even had Box been unable to testify, Barber's testimony largely corroborated Box's testimony that neither he nor Box threatened either Andrews or Lewis. Barber testified that he was just behind Box at the time of the shooting and that he was with him at all times prior to and immediately after the shooting. Barber also denied that Box rushed at Andrews immediately before being shot. While Box's civil suit against Andrews could be used to establish bias, somewhat similar bias could likewise stem from the fact that Andrews' shots left Box a paraplegic, confined to a wheelchair, a fact plainly evident at trial. That the shooting occasioned such severe and permanent impairment of Box provided the jury with ample basis for discounting his testimony due to bias (even if his lawsuit was not taken into account).

After considering the relevant factors, we conclude the error was harmless beyond a reasonable doubt.

**B.      Did the Trial Court Err By Refusing to Allow Andrews to Cross-Examine the Victim Regarding his Parole Status at the Time of the Shooting?**

The trial court granted the State's motion in limine preventing Andrews from asking Box about any of his "alleged misconduct or extraneous bad acts or offenses." While on the stand, Box admitted that he had previously pled guilty to a felony and that he was sentenced to fifteen years' confinement. During his cross-examination of Box, Andrews approached the bench and notified the court that he wanted to inquire about Box' parole status at the time of the shooting, but the trial court refused to allow questioning on the subject. Andrews made an offer of proof

10

outside the presence of the jury, during which Box testified that he remained on parole at the time of the shooting and that he was aware that his parole could be revoked if he committed a crime. Box also admitted to having consumed drugs and alcohol the night before the shooting, despite the fact that such conduct violated some of the conditions of his parole.

In his second point of error, Andrews argues that the trial court improperly prevented him from cross-examining Box regarding his parole status at the time of the shooting.

As stated above, we are to review a trial court's decision to limit cross-examination under an abuse-of-discretion standard. *See Hammer*, 296 S.W.3d at 561; *Baldez v. State*, 386 S.W.3d 324, 327 (Tex. App.—San Antonio 2012, no pet.). Trial courts have "broad discretion to impose reasonable limits on cross-examination to avoid, *inter alia*, harassment, prejudice, confusion of the issues, endangering the witness, and the injection of cumulative or collateral evidence." *Lagrone v. State*, 942 S.W.2d 602, 613 (Tex. Crim. App. 1997).

On cross-examination, with the jury present, Box testified that he had been convicted of a felony—driving while intoxicated—and that he had been sentenced to fifteen years in prison. During questioning from Andrews, he also testified that he was unaware of an active arrest warrant for him due to a parole violation. When Box was asked if there was any reason why there would be such an active parole warrant for his arrest, Box testified, "Well, I haven't been to parole since I got shot. I haven't been to parole. So I've been – the only place I've been is to the hospital, the doctors, and back to the house."

During the offer of proof, the following exchange took place between Andrews and Box regarding his prior conviction and parole:

11

Q.     Mr. Box, you were sentenced to 15 years of imprisonment on January 2nd, 2003; is that correct?

A.     Yes, sir.

. . . .

Q.     When were you released on parole?

A.     Yes, I was.

Q.     What date?

A.     June 4th.  I'm not sure of the year.  I know it was June 4th because that's my brother's birthday.

Q.     And you were still on parole at the date of the shooting?

A.     Yes, sir.

Q.     Would it be fair to say you didn't enjoy your time in prison?

A.     It would be fair to say, yes, sir.

Q.     And immediately prior to the shooting – and while you're on parole, you still owe the State the remainder of your sentence, don't you?

A.     Yes, sir.

Q.     And you were released on certain conditions?

A.     Yes, sir.

Q.     Not supposed to commit any other crime while you're on parole; is that correct?

A.     I haven't.

Q.     But that's one of the conditions?

A.     Okay.  And I haven't.

12

Q. Okay. And if you commit another crime while on parole, the parole board can revoke your parole and send you back to prison, can't they?

A. Yes, sir.

Q. To finish serving the remainder of your sentence?

A. Yes, sir.

. . . .

Q. Do you know it's a crime to threaten someone with violence?

A. I hadn't threatened somebody.

Q. Do you know it's a crime to threaten someone with violence?

A. I'm sure it is.

Q. You know it's a crime to throw someone down on the ground, don't you?

A. No, I didn't. No, I didn't know it was a crime.

. . . .

Q. (BY MR. HENRY:) You're not supposed to drink or do drugs while you're on parole?

A. No.

Q. That didn't stop you the night before the shooting, did it?

A. No, sir. I had a little social drink, you know . . . . It's not like a -- go ahead.

Q. Well, no. I'm going to give you an opportunity to answer?

A. I'm finished. I'm finished.

Q. In fact, you drank the morning of the shooting, didn't you?

13

A.     No, sir.

Q.     Your buddy, Steven Barber, knew you were on parole, didn't he?

A.     I don't know what Steve knows.

Q.     You knew what would happen if Dick called the police and told them you had thrown him on the ground, didn't you?

A.     No, sir. I'd rather he did call the police and tell them I threw him on the ground, tell you the truth.

Q.     If he had called the police, you would have been arrested, would you not?

A.     I don't know that.

Q.     And you would have been arrested and sent back to the penitentiary?

A.     I don't know that either.

Beyond the fact that a witness has been convicted of a crime, the details of the offense are not admissible. *Mays v. State*, 726 S.W.2d 937, 953 (Tex. Crim. App. 1986); *Jabari v. State*, 273 S.W.3d 745, 753 (Tex. App.—Houston [1st Dist.] 2008, no pet.). While Andrews was permitted to establish that Box had been convicted of a felony or other admissible offense, he could not inquire as to the circumstances surrounding the offense. *See* TEX. R. EVID. 609(a).

In this case, Andrews is arguing that Box being on parole is admissible to show the witness' bias in favor of testifying for the State. However, for such evidence to be admissible, "[t]he proponent of evidence to show bias must show that the evidence is relevant." *Woods v. State*, 152 S.W.3d 105, 111 (Tex. Crim. App. 2004). "The proponent does this by demonstrating that a nexus, or logical connection, exists between the witness's testimony and the witness's

14

potential motive to testify in favor of the other party." *Id.* In other words, a showing must be made that the witness "had the expectation that he would be rewarded for testimony favorable to the State or punished for testimony that was unfavorable to the State." *Id.* at 112.

Andrews argues that there is a nexus between Box's parole status and his potential motive to testify because

> [t]he complainant's actions in threatening Appellant, throwing him to the ground, and consuming alcohol and drugs would have most assuredly resulted in a revocation of his parole. The complainant's fear of returning to prison was a legitimate ground upon which to cross-examine.

From the record before us, it would not be outside the zone of reasonable disagreement for the trial court to have concluded that Andrews failed to show a nexus between Box's testimony and his parole status. In front of the jury, Box acknowledged that he was a convicted felon, that he was on parole, and that he was unaware of an active parole warrant for his arrest. There was no evidence tending to show that Box's testimony had any effect on his actual parole status. *See id.*; *Carpenter v. State*, 979 S.W.2d 633, 634–35 (Tex. Crim. App. 1998); *see also Irby v. State*, 327 S.W.3d 138, 147–48 (Tex. Crim. App. 2010) ("[A] 'vulnerable relationship' based on a witness's pending charges or probationary status does not hover cloud-like in the air, ready to rain down as impeachment evidence upon any and all such witnesses. There must be some logical connection between that 'vulnerable relationship' and the witness's potential motive for testifying as he does."). There was also no evidence that Box expected to be rewarded for testimony favorable to the State, or punished for testimony that was unfavorable to the State. In any event, testimony from not only Box, but also from Barber and Lewis would be

detrimental to his parole status, as his drug and alcohol use was undisputed. We find that the trial court acted within its discretion, and we overrule this point of error.

**C.      Did the State Give Adequate Notice of Intent to Introduce Extraneous Bad Acts?**

On May 29, 2013, the State filed its notice of intent to use extraneous offenses. The day before the punishment phase began, Andrews objected to two of the extraneous offenses listed in the State's notice because the two listed offenses failed to identify the victim. The trial court overruled the objection and allowed evidence of the extraneous acts, which consisted of testimony by Detectives Brad Thacker and Kimberly Weaver as well as Lewis and Barber discussing prior acts of violence by Andrews, all of which were directed toward Lewis. In his third point of error, Andrews argues that the trial court erred in admitting the evidence of prior bad acts because the State's notice failed to identify the victims in two of the offenses.[6]

We review the trial court's decision to admit extraneous-offense evidence during the punishment phase of a trial under an abuse of discretion standard. *Mitchell v. State*, 931 S.W.2d 950, 953 (Tex. Crim. App. 1996).

During the punishment phase of the trial, the State may offer evidence as to any matter the court deems relevant to sentencing, including, but not limited to, the prior criminal record of the defendant and, notwithstanding Rules 404 and 405 of the Texas Rules of Evidence,

> any other evidence of an extraneous crime or bad act that is shown beyond a
> reasonable doubt by evidence to have been committed by the defendant or for

---

[6]To the extent Andrews argues about more than the two specified offenses to which he objected at trial or that the listed offenses failed to include the date and county of the offense, no error was preserved for our review because he failed to raise those arguments at trial.

16

which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.

TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a) (West Supp. 2013); *see* TEX. R. EVID. 404, 405. The State, on timely request by the defendant, must give reasonable notice of extraneous crimes or bad acts that the State intends to introduce during the punishment phase. TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(g) (West Supp. 2013). The purpose of reasonable notice is to allow the defendant adequate time to prepare for the State's introduction of the extraneous offenses at trial. *Scott v. State*, 57 S.W.3d 476, 480 (Tex. App.—Waco 2001, pet. ref'd); *Self v. State*, 860 S.W.2d 261, 264 (Tex. App.—Fort Worth 1993, pet. ref'd). This avoids unfair surprise and trial by ambush. *Nance v. State*, 946 S.W.2d 490, 493 (Tex. App.—Fort Worth 1997, pet. ref'd). The reasonableness of the notice turns on the facts and circumstances of each case. *Scott*, 57 S.W.3d at 480.

The two offenses Andrews objected to read as follows,

That on or about, December 25, 2011, the Defendant, Richard Junkin Andrews, did commit the offense of Assault (BI)/Assault (FV) in Bowie County, Texas.

. . . .

That on or about, January 26, 2012, the Defendant, Richard Junkin Andrews, did commit the offense of Harassment in Bowie County, Texas.

The statute requires the State to list the date, the name of the victim, and the county in which the alleged crime or bad act occurred. TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(g). As Andrews points out, two of the offenses listed in the State's notice fail to identify the victim. However, some Texas courts hold that substantial compliance with the statute is sufficient to give notice. As we noted in *McQueen v. State*, the Fort Worth Court of Appeals, in *Nance v.*

17

*State*, held that the State substantially complied even though it failed to list the county of an unadjudicated offense. *McQueen v. State*, 984 S.W.2d 712, 716 (Tex. App.—Texarkana 1998, no pet.) (citing *Nance v. State*, 946 S.W.2d 490, 493 (Tex. App.—Fort Worth 1997, pet. ref'd)). Likewise, the Beaumont Court of Appeals, in *Hohn v. State*, held that the State substantially complied with Article 37.07, Section 3(g) when it gave a range of three months in which the extraneous offenses took place rather than a specific date. *McQueen*, 984 S.W.2d at 716 (citing *Hohn v. State*, 951 S.W.2d 535 (Tex. App.—Beaumont 1997, pet. ref'd)).

The State argues that its notice substantially complied with the statutory requirements because, at the bottom of the offenses listed in the notice are two paragraphs that state,

> That, prior to the date alleged in the indictment, the Defendant, Richard Junkin Andrews, did repeatedly and continuously engage in assaultive, violent behavior against others, including but not limited to, Vallory Lewis.

> That, prior to the date alleged in the indictment, the Defendant, Richard Junkin Andrews, did repeatedly and continuously threaten and harass others, including but not limited to, Vallory Lewis.

The State maintains this is sufficient to show the identity of the victim of these acts.

Of the eight specific acts listed in the notice, only the last one identified a victim, and that victim was Lewis. The catch-all paragraphs immediately after that last-listed act do seem to indicate that Lewis is the victim of the other listed offense, but it could also be read to allege an entirely different act or pattern of acts. Andrews only objected to two of the eight offenses, even though five others similarly failed to identify the victim. Further, Andrews did not argue that he was unfairly surprised or that he needed more time in light of the State's oral clarification during arguments that Lewis was the victim of all the listed bad acts. If he had genuinely been surprised

18

by the revelation of these offenses, he might have requested a continuance to search out evidence concerning them; he made no such request. Under the present facts, even though the State's notice was, in part, needlessly vague, we find that the State substantially complied with the notice requirements and overrule this point of error.

**D.      Was There a Fatal Variance Between the Indictment and the Proof of Trial?**

The indictment in this case alleged that Andrews injured "William Boc" by shooting "William Box." In his fourth point of error, Andrews contends that the evidence supporting his conviction is legally insufficient because there is a fatal variance between the indictment and the proof at trial as there was no proof that he injured a "William Boc."

"A variance occurs when there is a discrepancy between the allegations in the charging instrument and the proof at trial." *In re S.C.*, 229 S.W.3d 837, 841 (Tex. App.—Texarkana 2007, pet. denied); *see Gollihar v. State*, 46 S.W.3d 243, 246 (Tex. Crim. App. 2001). Variances are mistakes of one sort or another; sometimes they make no difference at all, sometimes they make all the difference. *Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011). A variance between the indictment and the evidence may be fatal to a conviction because due process guarantees that the defendant have notice of the charges against him. *Rojas v. State*, 986 S.W.2d 241, 246 (Tex. Crim. App. 1998). "The widely-accepted rule, regardless of whether viewing variance as a sufficiency of the evidence problem or as a notice-related problem, is that a variance that is not prejudicial to a defendant's 'substantial rights' is immaterial." *Gollihar*, 46 S.W.3d at 247–48. In determining if the defendant's substantial rights have been prejudiced, we must consider two questions:

19

whether the indictment, as written, informed the defendant of the charge against him or her sufficiently to allow such defendant to prepare an adequate defense at trial, and whether prosecution under the deficiently drafted indictment would subject the defendant to the risk of being prosecuted later for the same crime.

*S.C.*, 229 S.W.3d at 841 (citing *Dickey*, 189 S.W.3d 339, 345 (Tex. App.—Texarkana 2006, no pet.)); *see Brown v. State*, 159 S.W.3d 703, 709 (Tex. App.—Texarkana 2004, pet. ref'd).

Here, the indictment charged,

RICHARD JUNKIN ANDREWS hereinafter referred to as the Defendant, heretofore on or about <u>February 26, 2012</u>, did then and there intentionally, knowingly or recklessly cause bodily injury to <u>William Boc</u> by <u>shooting William Box with a firearm</u>, and the defendant did then and there use or exhibit a deadly weapon, to wit: <u>a firearm</u>, during the commission of said assault.

During voir dire, the State displayed for the jury what it purported was the wording in the indictment; however, it recited "William Box" in both places and not "William Boc" in one of them. Andrews objected, arguing that the indictment listed the "victim in this case [as] a William Boc, B-O-C, not a William Box," and that if the State was going to amend the indictment during trial, he requested a ten-day continuance. The State argued that the name "Boc" was merely a typographical error. During arguments on Andrews' objection, the State highlighted that the name "Boc" was absent from all other pleadings, and the trial court noted that the probable cause affidavit listed the victim as "William Box." The trial court denied the motion for continuance, carried the ruling on the indictment, and granted Andrews a running objection on the subject.

After voir dire had continued, Andrews objected once again, arguing that if the State was allowed to proceed on the indictment it showed the jury (with both names as "Box"), it would change the charge itself "from a transferred intent case to a direct aggravated assault case" and

20

that the court was allowing a trial amendment to the indictment; for that reason, he requested a ten-day continuance. Andrews argued that he had prepared his defense based on a transferred intent charge, and he produced copies of his powerpoint slides in which he discussed transferred intent and listed both "Box" and "Boc" as potential witnesses. The State again argued that it was merely a typographical error and that the name "Box" appeared elsewhere in the indictment, that the name "Box" appeared in every other relevant document and pleading in the case while the name "Boc" appeared nowhere else. The State concluded that, as a result, Andrews could not argue unfair surprise or that this was a transferred intent case. The trial court noted that the "X" and "C" keys are directly next to each other on a standard keyboard and that the name was spelled with an "X" and not a "C" in every pleading and document except for the indictment. Based on those considerations, the trial court overruled Andrews' objection and request for continuance, remarking,

> I think it's a typographical error. I don't think it's material. I don't think it's prejudiced the defendant in any way. I don't think it's misled him. I think that all the preparation for this trial has been towards an alleged victim of Mr. Box, and I think you've had sufficient notice.

The facts of *McNeal v. State* are similar to the present facts. In *McNeal*, the indictment alleged that McNeal "did unlawfully then and there intentionally and knowingly cause the death of Lena Mae Williams, an individual, by shooting the said Lena Mae William with a pistol." *McNeal v. State*, 600 S.W.2d 807 (Tex. Crim. App. [Panel Op.] 1980). The court noted that the name was Williams "[t]hroughout the record in allegations and testimony" and that the name "William" did not appear except for the second allegation in the indictment. *Id.* at 808. In affirming the conviction, the court found that the different names in the indictment were "an

obvious typographical error" and held that there was no variance between the indictment and the proof at trial. *Id.*

Here, as in *McNeal*, the correct name is in the indictment once, and the name "Box" is found throughout the pleadings, while the name "Boc" does not appear anywhere else. There is also significant evidence that the error was merely a typographical mistake. Accordingly, we find no material variance between the indictment and the evidence, and we overrule this point of error.

> **E.  Did the Trial Court Err in Refusing to Submit a Jury Charge on Idem Sonans?**

In his fourth point of error, Andrews argues that the trial court erred by refusing to submit a jury charge on idem sonans because the two names in the indictment, "Box" and "Boc," did not sound the same to a discerning ear.

Our review of alleged jury charge error involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994); *see Sakil v. State*, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009); *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). Initially, we determine whether an error occurred, and then we "determine whether sufficient harm resulted from the error to require reversal." *Abdnor*, 871 S.W.2d at 731–32; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g), *reaff'd by Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003).

The doctrine of idem sonans permits the misspelling of a name in legal documents if the attentive listener would find difficulty distinguishing the misspelling from the proper spelling when pronounced. *Martin v. State*, 541 S.W.2d 605, 608 (Tex. Crim. App. 1976). If an issue

22

requiring the application of the rule of idem sonans is raised by the evidence in a jury trial, the trial court, at the request of the defendant, should instruct the jury to resolve the issue by determining whether the two names could sound the same to the discerning ear. *Id.*

Here, the issue of idem sonans was raised because Andrews argued, and the trial court agreed, that the names "Boc" and "Box" do not sound alike to the discerning ear and that they "are totally two different names." Andrews objected to the court's charge, properly requested an instruction on the issue, and proffered the following idem sonans instruction:

> You are instructed that unless you find from the evidence beyond a reasonable doubt that the names William Boc, appearing in the indictment, and William Box, as testified to in the trial are usually pronounced in such a way that the names are indistinguishable or that the attentive ear finds difficulty in distinguishing them when pronounced, you will find the defendant "Not Guilty."

We find that the trial court erred by refusing to submit an instruction on idem sonans.

Having found error, we must determine whether the failure to include the idem sonans instruction harmed Andrews. The level of harm an appellant must demonstrate as having resulted from the erroneous jury instruction depends on whether the appellant properly objected to the error. *Abdnor*, 871 S.W.2d at 732. When a proper objection is made at trial, as it was here, reversal is required if there is "some harm" "calculated to injure the rights of defendant." *Id.* at 731; *see Almanza*, 686 S.W.2d at 171. "The harm caused by the error must be considered 'in light of the entire jury charge, the state of the evidence, including the contested issues and the weight of probative evidence, the arguments of counsel and any other relevant information revealed by the record of the trial as a whole.'" *Kihega v. State*, 392 S.W.3d 828, 835 (Tex. App.—Texarkana 2013, no pet.) (quoting *Almanza*, 686 S.W.2d at 171); (citing TEX. CODE

23

CRIM. PROC. ANN. art. 36.19).  Additionally, Andrews must have suffered actual harm, not merely theoretical harm.  *Id.*

Here, Andrews argued that he had prepared his defense based on a transferred intent charge and that the variant spelling had substantially misled him.  In support of his argument, he produced copies of his powerpoint slides in which he discussed transferred intent, and Andrews' witness list included both William Box and William Boc as potential witnesses.  Box testified that his name was spelled B-O-X and that he had never gone by the name Boc.  As in its variance argument, the State again contended that the spelling of B-O-C was merely, and obviously, a typographical error and that the name "Box" appeared elsewhere in the indictment, and in every other relevant document and pleading in the case, while the name "Boc" appeared nowhere else.  The State, therefore, takes the position that Andrews could neither argue unfair surprise nor claim that this was a transferred intent case.

Here, the court instructed the jury, in relevant part, that it was to find Andrews guilty if it found beyond a reasonable doubt that Andrews "did then and there, intentionally, knowingly or recklessly, cause bodily injury to <u>William Boc</u> by <u>shooting William Box with a firearm</u> . . . ." Despite the differences in spelling and pronunciation between "Box" and "Boc," the jury still found Andrews guilty.  Even if Andrews' assertion that he had predicated his defense on transferred intent was more than mere trialcraft, his defense did not suffer for it, as his claim of self-defense, and his questioning of all relevant witnesses, save the "innocent" injured party, would be the same whether he was charged with aggravated assault by transferred intent or direct aggravated assault.  The evidence clearly showed that Box was the injured party, that no one

24

relevant to the case was named Boc, that Andrews intentionally shot Box, and that the State was prosecuting charges against Andrews for shooting Box. Because the State admitted on the record that the name "Boc" was a typographical error that should have been "Box," the trial court's failure to include the instruction did not place Andrews in danger of double jeopardy.

Upon considering the relevant factors, we find that Andrews did not suffer actual harm from the trial court's error and, therefore, overrule this point of error.

**F.      Did the Trial Court Err in Excluding the FBI Law Enforcement Bulletin?**

During trial, Andrews attempted to introduce a portion of a periodical published online by the FBI, the October 2004 FBI Law Enforcement Bulletin. The State objected, arguing that the bulletin was irrelevant and inadmissible under Rule 403 of the Texas Rules of Evidence because it would confuse and mislead the jury. The trial court refused to admit the bulletin into evidence, but did not specify the grounds upon which it sustained the State's objection. In his sixth and final point of error, Andrews contends that the trial court erred in excluding the bulletin.

We review the trial court's decision to admit or exclude evidence under an abuse-of-discretion standard, and we will not disturb the trial court's ruling if it is within the zone of reasonable disagreement. *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007); *Smith v. State*, 401 S.W.3d 915, 917 (Tex. App.—Texarkana 2013, pet. ref'd). We may not substitute our own decision for that of the trial court. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). If the trial court's decision on the exclusion of evidence is supported by the record,

there is no abuse of discretion, and the trial court will not be reversed.  *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002); *Montgomery*, 810 S.W.2d at 379.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  TEX. R. EVID. 401.  Even if the evidence is relevant, in order to be admitted over the State's objection, the evidence must also meet the requirements of Rule 403, which provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403.  "'[P]robative value' refers to the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence." *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006).  In making a determination under Rule 403, a trial court must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against, (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or repeat evidence already admitted.  *Id.* at 641–42.

26

The relevant portion of the bulletin is entitled *One-Shot Drops*, *Surviving the Myth*. The article examined the alleged myth that law enforcement officers with the correct gun and ammunition can incapacitate an offender with a single shot. The article gave several examples of law enforcement officers shooting an offender several times in the chest without incapacitating the offender.

Andrews shot Box several times at close range. Throughout the trial, Andrews asserted that he shot Box in self-defense and that shooting several times was justifiable under the circumstances. At trial, the State argued that firing so many shots was evidence that Andrews was shooting out of malice rather than self-defense. Andrews argued that in light of the State's argument, the bulletin's article exploring the myth of "one shot drops" in the field of law enforcement rendered his self-defense claim more probable.

While the article is aimed at law enforcement, the facts in the article tend to make Andrews' argument—that he could have shot Box several times and still have done so in self-defense—more probable. Therefore, the article is relevant. We next determine whether the probative value of the bulletin was substantially outweighed by the danger of unfair prejudice. Because Andrews' argument was already in front of the jury, the bulletin does not create a tendency to suggest a decision on an improper basis. The bulletin could be viewed as confusing or distracting because it is aimed specifically at law enforcement and it examines specific situations where law enforcement officers shot armed suspects several times without incapacitating the suspects. Here, there is no evidence that Box was armed, and Box and Barber both testified that Box fell to the floor after one shot. As this purports to be an FBI publication,

27

there is a mild risk that it could be given undue weight by the jury. The time needed to develop the bulletin was not overly burdensome.

As per the factors examined hereinabove, we find that the trial court was within its discretion to exclude the bulletin. Accordingly, we overrule this point of error.

We affirm the trial court's judgment.


Bailey C. Moseley
Justice

Date Submitted:     March 12, 2014
Date Decided:       April 23, 2014

Publish